# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

|  |  |  |
|---|---|---|
| TIMOTHY CHEEK, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:22-CV-86 |
| | ) | |
| GL NV24 SHIPPING, INC., | ) | |
| HYUNDAI GLOVIS CO., | ) | |
| G-MARINE SERVICE CO., LTD, | ) | |
| NORTON LILLY | ) | |
| INTERNATIONAL, | ) | |
| T&T SALVAGE, LLC, and | ) | |
| JOHN DOE ENTITIES 1 | ) | |
| THROUGH 10, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case arises from the capsize of the *M/V Golden Ray* ("Golden Ray" or "the vessel") in the St. Simons Sound. Timothy Cheek and sixteen other plaintiffs ("Cheek Plaintiffs"),[1] all involved in the local tourism industry, filed suit for damages sustained due to the capsize against (1) the vessel's owner, GL NV24 Shipping, Inc. ("GL NV24"); (2) the vessel's charterer,

---

[1] Scott Owens, Owens Management, LLC, Rob Aldridge, Southbound Expeditions, LLC f/k/a Hit n Run Fishing, LLC, Jeffrey Stokes, Charles Hicks, Kevin Dezern, Georgia Saltwater Adventures, LLC, Timothy Dykes, Greg Hildreth, Robert Williams, Turtle Tides, LLC, Robert Davis, Island Airboat Tours, LLC, Jamie Sanders, and Georgia Adventure Sports LLC.

Hyundai Glovis Co. ("Hyundai Glovis"); and (3) the vessel's operator and technical superintendent, G-Marine Service Co., Ltd. ("G-Marine") (collectively "Vessel Defendants"); as well as (4) the vessel's agent, Norton Lilly International, Inc. ("Norton Lilly"); (5) the wreck removal company, T&T Salvage LLC ("T&T"); and John Doe Entities 1 through 10. Dkt. No. 56. This Order addresses the Vessel Defendants' and Norton Lilly's motions to dismiss. Dkt. No. 73 (Vessel Defendants); Dkt. No. 74 (Norton Lilly).

## BACKGROUND[2]

On September 7, 2019, the Golden Ray, a 656-foot-long car- and truck- carrier, arrived at the Port of Brunswick in Brunswick, Georgia. Dkt. No. 56 ¶¶ 1, 36, 52. Hyundai Glovis managed and chartered the Golden Ray. Id. ¶ 25. G-Marine acted as the operator and technical superintendent "that managed the crew of the Golden Ray and maintained responsibility for the safety management system on the Golden Ray." Id. ¶ 26. Norton Lilly was the Golden Ray's agent in the Port of Brunswick. Id. ¶ 27. "As the Golden Ray's agent, Norton Lilly worked with the Golden Ray's crew to ensure cargo was loaded safely and properly and that appropriate

---

[2] At this stage, the Court must "accept as true all facts alleged in the non-moving party's pleading, and . . . view those facts in the light most favorable to the non-moving party." Perez v. Wells Fargo, N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).

safeguards were in place to ensure the safe transport from the Port of Brunswick to its final destination." Id. ¶¶ 27, 39-40, 42.

Norton Lilly developed the vessel's preliminary load plan, "which included compiling the proposed cargo to be loaded and offloaded and determining whether there was enough room on board the Golden Ray for the proposed cargo at each port with the projected available space." Id. ¶ 44. Norton Lilly submitted the preliminary load plan, which allegedly contained inaccurate data, to Hyundai Glovis and the chief officer. Id. ¶¶ 45, 49.

The chief officer reviewed the preliminary load plan to estimate the cargo's weight, which he entered into the vessel's LOADCOM computer, "a stability computer used to calculate the ship's center of gravity." Id. ¶ 47. The chief officer also manually entered information about the vessel's ballast, fuels, and fresh water into the LOADCOM computer to calculate the ship's center of gravity, even though the computer could input this data accurately on its own. Id. ¶ 48. G-Marine, the Golden Ray's operator, did not provide a training program for the LOADCOM computer, and the chief officer had never previously used a LOADCOM computer. Id. ¶ 72. The Chief officer was given "a few hours" of training on the computer when he or she joined the Golden Ray crew. Id. G-Marine created a safety management system, which required the Golden Ray's master to approve the chief officer's LOADCOM calculations. Id. ¶ 50. The master did not do so, "thereby

fail[ing] to take any corrective action to stabilize the vessel for its voyage." Id. ¶ 51.

On September 8, 2019, a little after 1:00 a.m., the Golden Ray left the Port of Brunswick, entering the St. Simons Sound. Id. ¶ 52. The vessel encountered "[c]upcake conditions"—"light south wind, calm, good visibility, [and] bright." Id. ¶ 56. The vessel turned starboard, heading right and east out of the Sound. Id. ¶ 57.

The vessel then listed starboard. Id. ¶ 58. The captain was unable to right the vessel and it continued to spin starboard. Id. The vessel capsized with its portside down on the edge of the Sound, just northeast of Jekyll Island, Georgia. Id. ¶ 60. Its starboard side protruded from the water. Id.

"The Golden Ray was grounded near environmentally sensitive areas that serve as a unique habitat for a variety of species, including, but not limited to, shrimp, fish, migratory birds, crabs, and food sources for all marine life, including, but not limited to, fiddler crabs." Id. ¶ 74. The coastal environment in which the Golden Ray capsized "is also the main attraction of tourism to the area and serves as the epicenter for individuals and entities, like Plaintiffs, that run charter boat tours, fishing tours, water sport equipment rentals and tours, and other business sustained by the area's tourism." Id. ¶ 75.

After it capsized, the vessel "immediately began" to leak fuel oil, and fires ignited that lasted for nearly twenty-four hours. Id. ¶¶ 61–62.

On September 23, 2019, the United States Coast Guard ("Coast Guard") reported that the ship was leaking "sporadic discharges" of oil from its hull. Id. ¶ 65. The Coast Guard noted that oil was spotted on nearby shorelines, rivers, and marshes. Id. On October 1, 2019, more fuel was discharged, and the Jekyll Island Authority reported that "oil was observed on Jekyll Island beaches and nearshore waters." Id. ¶ 66.

The Coast Guard and the National Transportation Safety Board ("NTSB") conducted an investigation and hearing about the capsize. Id. ¶ 67. The entities concluded that the Golden Ray was "not in compliance with the 2008 Intact Stability Code because the vessel had too much cargo at a high center of gravity, a situation that could have been corrected by ballasting." Id. They also "determined that the vessel had been out of compliance with the 2008 Intact Stability Code during the two (2) prior port stops." Id. ¶ 68. The entities explained that these issues were caused by loading the vessel with too many vehicles at a high center of gravity, which rendered the vessel top-heavy and placed it in danger of capsizing. Id. ¶ 71.

On or about October 29, 2019, "Defendants caused over 6,000 tons of rocks to be dropped into the Sound and around the Golden

Ray" "in an attempt to stabilize the wreckage." Id. ¶ 76. They did this in an area known as "Snag Alley." Id.

By December 12, 2019, approximately 320,000 gallons of fuel mixed with water were pumped out of the Sound. Id. ¶ 77. Approximately 44,000 gallons of "petroleum products, hazardous substances, and 4,200 cars remained submerged in local waters." Id.

In January 2020, T&T accepted responsibility for removing the wreckage. Id. ¶ 80. T&T's Wreck Removal Plan was to mechanically cut the vessel into eight large sections, which were to be removed, and to place an Environmental Protection Barrier ("EPB") to contain the vessel's pollutants. Id. ¶ 82.

On January 19, 2020, another fire began on the vessel. Id. ¶ 85. On November 6, 2020, cutting and lifting operations began, but the cutting chain broke within two days. Id. ¶ 87. "Repeated fires causing additional discharges of debris and hazardous fluids occurred throughout the duration of [the] wreck removal." Id. ¶ 88.

T&T put an EPB in place on June 1, 2020. Id. ¶ 86. Oil also made it past the EPB on three occasions, "allowing oil to infiltrate the coastal wetlands, marshlands, estuaries, and beaches." Id. ¶ 89. "This oil and other oil-based pollutants are likely to remain suspended in the water column and embedded in the sediment for the foreseeable future." Id. ¶ 90.

According to the complaint, the salvage operations resulted in numerous cars, car parts, and other debris falling into the Sound "where many remain, while others were carried off in the currents." Id. ¶ 91. The various car parts and debris negatively impact people and entities that "fish, boat, and rely on the local waterways to sustain their tourism-based businesses." Id. ¶ 91. The debris also prevent access to Snag Alley and damage equipment that people and entities use in their tourism-based businesses. Id. Salvage operations finished in October 2021. Id. ¶ 92.

Between April 15, 2022, and June 3, 2022, Cheek Plaintiffs—all "individuals and entities actively engaged in Georgia's tourism industry," dkt. no. 56 ¶¶ 7–24—presented their OPA claims to GL NV24 and Hyundai Glovis Co. Id. ¶ 33. The presentments described the capsize and its impact on the claimants, stated sums which the claimants would accept for a general release of their claims, and explained how those sums were calculated. Dkt. No. 73-1 at 1–4.

After the statutorily allotted time passed, Cheek Plaintiffs filed suit against Vessel Defendants, Norton Lilly, T&T, and John Doe Entities 1 through 10. Dkt. No. 1. Vessel Defendants and Norton Lilly filed motions to dismiss. Dkt. No. 24; Dkt. No. 35. Cheek Plaintiffs filed an amended complaint, dkt. no. 56, and the Court denied the motions to dismiss as moot, dkt. no. 59.

In their amended complaint, Cheek Plaintiffs assert the following claims:

1. Strict liability under the Oil Pollution Act of 1990 ("OPA") (Count I) against GL NV24 and Hyundai Glovis, dkt. no. 56 ¶¶ 98-113;

2. Negligence under federal maritime law and state law against all Defendants (Count II), id. ¶¶ 114-23;

3. Negligence per se against all Defendants (Count III), id. ¶¶ 124-29;

4. Public nuisance against all Defendants (Count IV), id. ¶¶ 130-50;

5. Trespass against all Defendants (Count V), id. ¶¶ 151-57;

6. Negligence and strict liability for ultrahazardous activity against T&T Salvage (Count VI), id. ¶¶ 158-68.

Cheek Plaintiffs also seek punitive damages, id. ¶¶ 169-72, as well as attorneys' fees and expenses of litigation, id. ¶¶ 173-76.

Subsequently, Vessel Defendants and Norton Lilly filed motions to dismiss Cheek Plaintiffs' amended complaint. Dkt. No. 73; Dkt. No. 74. After briefing and oral argument, these claims are ripe for adjudication.

**DISCUSSION**

**I.   OPA Presentment**

The Vessel Defendants[3] argue Cheek Plaintiffs' presentments are insufficient in two ways: (1) their presentments include both OPA and non-OPA damages, and (2) their presentments fail to include all the types of OPA damages they now assert in this suit. Dkt. No. 73 at 7–10.

**A. Presentment of a sum certain**

33 U.S.C. Section 2713(a) provides, "all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source." 33 U.S.C. Section 2701(3) defines "claim" as "a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." The OPA does not further define "sum certain."

"It is axiomatic that the interpretation of a statute must begin, and usually ends, with the text of the statute." Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., 51 F.3d 235, 237 (11th Cir. 1995) (first citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992); and then citing United States v. Kirkland, 12 F.3d 199, 202 (11th Cir. 1994)). "When interpreting the text,

---

[3] Cheek Plaintiffs bring their OPA claim against only GL NV24 and Hyundai Glovis, not G-Marine, dkt. no. 56 ¶¶ 98–113, but Vessel Defendants filed their motion to dismiss collectively, dkt. no. 73. Thus, the Court refers to "Vessel Defendants" when discussing the OPA claim, but it recognizes that G-Marine is not implicated by this claim.

we give undefined terms their plain, ordinary, and most natural meaning." Id. (first citing Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995); and then citing Brown v. Gardner, 513 U.S. 115, 117–18 (1994)).

The plain and ordinary meaning of "sum certain" is a fixed amount of money. See Sum Certain, Black's Law Dictionary (11th ed. 2019) ("Any amount that is fixed, settled, or exact."); Sum and Certain, Merriam-Webster Unabridged (2023) (defining "sum" as "an indefinite or specific amount of money" and "certain" as "fixed, settled, stated"); Sum and Certain, Oxford English Dictionary (2023) (defining "sum" as "[a] quantity or amount of money" and "certain" as "[d]etermined, fixed, settled; not variable or fluctuating; unfailing"). But this does not clarify what components may or must compose the fixed amount of money.

The Vessel Defendants argue that Cheek Plaintiffs did not present a "sum certain" because the amounts they alleged are "lump sum[s] . . . that fail[] to specify the portion of the sum that constitutes OPA damages." Dkt. No. 73 at 9; Dkt. No. 85 at 3–5. The Vessel Defendants highlight a sentence from each of the presentments, which states: "[Claimant] submits this claim pursuant to the [OPA] and demand for monetary damages pursuant to well established state law on the creation and maintenance of a public nuisance." Dkt. No. 73 at 9 (quoting Dkt. No. 73-1 at 3).

Courts have looked to the Federal Tort Claims Act ("FTCA") for guidance in interpreting the OPA's "sum certain" requirement. See Honeywell Int'l Inc. v. Sunoco (R&M), LLC, No. 518CV1176FJSML, 2022 WL 899524, at *2 (N.D.N.Y. Mar. 28, 2022); Honeywell Int'l Inc. v. Citgo Petroleum Corp., 574 F. Supp. 3d 76, 83 (N.D.N.Y. 2021); Nodine v. Plains All Am. Pipeline, LP, No. 17-CV-163-SMY-DGW, 2018 WL 4636242, at *3 (S.D. Ill. Sept. 27, 2018). The FTCA, like the OPA, requires claim presentment in the form of "a claim for money damages in a sum certain." 28 C.F.R. § 14.2; see also 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency."); 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency.").

In Sunoco, the District Court for the Northern District of New York evaluated the sufficiency of the plaintiff's OPA presentment based upon the Seventh Circuit's interpretation of the FTCA's sum certain standard. 2022 WL 899524, at *2. The Sunoco court explained,

> "OPA defines a 'claim' as 'a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident.'" "The OPA does not define the term 'sum certain.' However, the Seventh Circuit has addressed what is needed to satisfy the requirements for a 'sum certain' in the context of the Federal Tort Claims Act." "In Khan v. U.S., 808 F.3d

11

> 1169, 1172–73 (7th Cir. 2015), the Court noted, 'all
> that must be specified is "facts plus a demand for
> money;" if those two things are specified, "the claim
> encompasses any cause of action fairly implicit in the
> facts."'" "'But as "facts plus a demand for money" must
> be specified, failure to ask for any damages – any money
> – is fatal.'"

Id. (internal citations omitted) (alterations accepted); see also

Citgo, 574 F. Supp. 3d at 83 (same); Nodine, 2018 WL 4636242, at

*3 (using the "facts plus a demand for money" framework to evaluate

whether the plaintiffs presented a sum certain).

Like the Seventh Circuit's "facts plus a demand for money"

standard, the Eleventh Circuit has held that "[t]he FTCA's

[presentment] requirement is satisfied if the claimant '(1) gives

the agency written notice of his or her claim sufficient to enable

the agency to investigate and (2) places a value on his or her

claim.'" Brown v. United States, 838 F.2d 1157, 1160 (11th Cir.

1988) (quoting Adams v. United States, 615 F.2d 284, 289 (5th Cir.

1980)). The Eleventh Circuit "has taken a somewhat lenient approach

to the 'sum certain' requirement holding, for example, that even

where a claimant had not specifically stated the value of the

claim, attaching medical bills and repair estimates to the claim

notice could suffice." Tidd v. United States, 786 F.2d 1565, 1567

n.6 (11th Cir. 1986) (first citing Molinar v. United States, 515

F.2d 246 (5th Cir. 1975); and then citing Wardsworth v. United

States, 721 F.2d 503, 505–06 (5th Cir. 1983)); see also Molinar,

515 F.2d at 249 ("We are persuaded that plaintiff here has complied

12

with the procedure for filing a claim. The letter of October 19, 1971, included bills which totaled $1462.50. This was a 'sum certain.' The testimony at trial by the reviewing officer that 'the figures here simply (gave) me no basis on which . . . to take any action' cannot overcome the presentation made by the bills themselves."); Dalrymple v. United States, 460 F.3d 1318, 1325 (11th Cir. 2006) (quoting Tidd, 786 F.2d at 1567 n.6); Turner ex rel. Turner v. United States, 514 F.3d 1194, 1200 (11th Cir. 2008).

"However, '[the Eleventh Circuit] ha[s] held that the FTCA requires, at a minimum, that a claimant expressly claim a sum certain or provide documentation which will allow the agency to calculate or estimate the damages to the claimant.'" Dalrymple, 460 F.3d at 1325 (quoting Suarez v. United States, 22 F.3d 1064, 1066 (11th Cir. 1994)). In Tidd, the Eleventh Circuit favorably cited Wardsworth, 721 F.2d at 505–06, for its "discussi[on of the] sum certain requirement, and indicat[ion] that it could be met by merely providing the agency with facts from which it could estimate the value of the claim." Tidd, 786 F.2d at 1567 n.6.

Here, Nodine, 2018 WL 4636242, at *3, is particularly on-point. The Nodine plaintiffs—residents of the local area—presented aggregate damages of $16,916,645, comprised of $8,069,145 in "socioeconomic" and "environmental" damages and $8,069,145 in diminished property values. 2018 WL 4636242, at *3. The Nodine plaintiffs "detailed how the oil spill affected land use, property

13

values, surface water and sediments, and soil and groundwater in
the Highland community." Id. While the OPA permits landowners to
recover damages for removal costs, 33 U.S.C. § 2702(b)(1)(B),
"injury to, or economic losses resulting from destruction of, real
or personal property . . . by a claimant who owns . . . that
property," id. § 2702(b)(2)(B), or subsistence use of natural
resources, id. § 2702(b)(2)(C), the OPA does not permit land-
owning claimants to recover damages for injury to natural
resources, costs of providing increased public services during
removal activities, or any other "socioeconomic" damages that do
not fall within Section 2702(b)'s specifically delineated
categories. Thus, like Cheek Plaintiffs, the Nodine plaintiffs
included both OPA and non-OPA damages in their presentment and
estimated damages amount. 2018 WL 4636242, at *3. The Nodine court
found the Seventh Circuit's FTCA "facts plus [a] demand for money"
standard "instructive" and held that the presentment satisfied the
OPA's sum certain requirement. Id. It explained, "[w]hile
Defendants requested more specificity regarding Plaintiffs'
claimed damages in subsequent letters, the OPA merely requires
claimants to 'present all claims and damages' to the responsible
party; the statute does not require claimants to itemize damages
individually." Id.

Cheek Plaintiffs' presentments, like the Nodine plaintiffs'
presentment, includes both OPA and non-OPA damages. See Dkt. No.

77-1 at 2–40. Like in <u>Nodine</u>, including both OPA and non-OPA
damages does not in and of itself render Cheek Plaintiffs'
presentments insufficient. Instead, Cheek Plaintiffs' presentments
easily satisfy the OPA's "sum certain" requirement, applying
either the Eleventh Circuit's notice "sufficient to enable
investigat[ion]" plus a "value" standard or the Seventh Circuit's
"facts plus [a] demand for money" standard. Cheek Plaintiffs'
presentments, contrary to the Vessel Defendants' assertion, do not
simply state a "lump sum." Dkt. No. 73 at 9. Instead, Cheek
Plaintiffs' presentments include facts about the wreck, its impact
on the environment, and how this impacted the claimants. Dkt. No.
73-1 at 1–4. Cheek Plaintiffs also include specific data about how
the wreck impacted claimants' businesses. <u>See, e.g.</u>, <u>id.</u> at 2–4.
For example, Plaintiff Timothy Cheek included the following
information in his presentment:[4]

> Claimant is a former charter captain and the former
> owner of The Georgia Fishing Company. Claimant purchased
> the company *for $60,000 in 2012*. Between 2012 and 2020,
> Claimant dedicated his life to building the business,
> substantially increasing the average yearly income since
> the time it was purchased. As the business developed,
> Claimant began associating with other charter captains
> in the area and acted as a management company, assigning
> clients to those captains to ensure the company could
> handle the volume. Between 2015 and 2019, The Georgia
> Fishing Company booked more than 1,600 charters,
> *averaging more than 315 bookings per year*. Claimant
> personally guided many of these trips. However, between

---

[4] The Vessel Defendants use Plaintiff Timothy Cheek's presentment
letter as a sample letter because "[a]ll of the presentment letters
used the same format." Dkt. No. 73 at 9.

the time the Golden Ray capsized in 2019 and 2020, there was a lot of uncertainty in the charter fishing industry in the coastal Georgia area. Many charter captains regularly observed oil in the water and found oiled fish around St. Simons Sound. This forced many, including Claimant, to reevaluate their businesses. . . .

Claimant . . . had at least six (6) clients specifically cancel trips because they were afraid of eating contaminated fish. *Charter trips cost an average of $550, meaning he lost at least $3,300 when individuals cancelled their trips for this reason*. In an attempt to mitigate his losses, Claimant started fishing in other locations*, specifically in the St. Andrews Sound approximately 20 miles away from the marina where he stored his boat. Claimant's boat averaged 2.2 miles per gallon, meaning he burned an additional nine (9) gallons of fuel per trip. At an average of $4.00 per gallon, Claimant was spending an additional $36 per trip for fuel*.

Business as a whole severely declined after the Golden Ray capsized. Between 2015 and 2018, The Georgia Fishing Company booked an average of approximately 56 trips between September and December each year. However, from September 8, 2019 when the Golden Ray Capsized and December 31, 2019, *the company only booked 22 trips*. The following months were worse. Between 2016 and 2019, the company averaged approximately 139 bookings between January and May. The company *booked 20 total trips* between January 2020 and May 2020. Redacted trip logs are attached . . . . Claimant's tax returns for 2014-2019 are attached . . . .

Claimant made the difficult decision to sell The Georgia fishing Company in spring of 2020, approximately six (6) months after the Golden Ray capsized. . . . [T]he *business ultimately sold for $15,000*, $45,000 less than what it was purchased for and much less than its true value.

Id. at 2-3.

Plaintiff Timothy Cheek sought $304,543.03 "for a general release of his claims." Id. at 3. He explained in detail how he calculated this number:

> This amount includes reimbursement of $3,330 for the trips specifically cancelled due to concerns of catching contaminated fish and $756 for increased fuel costs between September 2019 and May 2020. The fuel costs were calculated by taking the total number of trips booked, dividing it in half (Claimant chartered approximately 50% of the Georgia Fishing Company bookings), and multiplying it by $36. This settlement amount also includes Georgia Fishing Company's lost business, which is calculated by taking the average number of trips between September and May for prior years, subtracting the trips booked between September 2019 and May 2020, multiplying the difference by $515 (the average booking price between 2015-2020), and then dividing that amount by two (2). This totaled $39,397.50. This amount further includes $100,000 representing the estimated loss in value to The Georgia Fishing Company, evidenced by the significantly discounted sales price. The amount also includes $61,059.53 for reimbursement of expert costs for sampling and lab testing to determine the impacts of oil on the St. Simons area. Finally, this amount includes an additional $100,000 for compensation for Claimant's annoyance and inconvenience and for his attorney's fees and expenses unrelated to sampling.

Id. at 3.

This presentment is far more detailed than the presentment that the court found satisfactory in Nodine. Plaintiff Timothy Cheek's presentments provided enough detail such that Vessel Defendants could easily understand the basis for his claims. Id. at 1-4. It clearly explained how he calculated the total sum sought and provided a corresponding monetary value for each type of damages he mentioned. Id. at 3. His presentment included more

detail than he had to provide under the sum certain standard, see Nguyen, 805 F.3d at 141, and it undoubtably provided the Vessel Defendants enough information "to calculate or estimate the damages" he believed would comprise a fair settlement amount, Dalrymple, 460 F.3d at 1325 (quoting Suarez, 22 F.3d at 1066); Nodine, 2018 WL 4636242, at *3 ("[T]he OPA merely requires claimants to 'present all claims and damages' to the responsible party; the statute does not require claimants to itemize damages individually."). Thus, like the Nodine plaintiffs' presentment, which was sufficient despite including both OPA and non-OPA damages, Cheek Plaintiffs' presentment was sufficient despite including OPA and non-OPA damages. The other Plaintiffs' presentments follow a similar pattern and satisfy the OPA presentment requirement for the same reasons. See Dkt. No. 77-1 at 2-36.

The Vessel Defendants try to distinguish Nodine, arguing that in that case "there was no indication (much less an express assertion) that claimants' presentments included claims under both OPA and state law." Dkt. No. 85 at 5 (citing Nodine, 2018 WL 4636243, at *2-3). But this only further supports that Cheek Plaintiffs' presentments were sufficient. Cheek Plaintiffs explicitly stated that the presentment included OPA and non-OPA claims, enumerated each type of claim, and provided a corresponding monetary value, while the Nodine plaintiffs sought recovery of

non-OPA damages without stating that they were not covered by the OPA, specifically delineating them, or providing a monetary value associated with them. Cheek Plaintiffs' presentment provided clearer notice to the Vessel Defendants and made it much easier for them to conduct their own investigation than the Nodine plaintiffs' presentment. See Brown, 838 F.2d at 1160 (explaining that the FTCA presentment requirement is satisfied by notice sufficient to enable investigation and an associated monetary value). Thus, the Vessel Defendants' attempt to distinguish Nodine only further supports the sufficiency of Cheek Plaintiffs' presentment.

The Vessel Defendants seem to argue that Cheek Plaintiffs should have specifically labeled which damages were OPA damages and which damages were not. Dkt. No. 73 at 7–9. But "the OPA merely requires claimants to 'present all claims and damages' to the responsible party; the statute does not require claimants to itemize damages individually." Nodine, 2018 WL 4636242, at *3. Yet, here, Plaintiff Cheek *did* individually itemize his damages, he simply did not label which damages were OPA damages and which were not. Dkt. No. 73-1 at 1–4. Calculating a number that represented only OPA damages would not have presented any difficulty for the Vessel Defendants because Plaintiff Cheek provided a corresponding monetary value for each type of damages he sought. Cf. Brown, 838 F.2d at 1160 ("The FTCA's filing

19

requirement is satisfied if the claimant '(1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim.'" (quoting Adams, 615 F.2d at 289)). Rejecting Cheek Plaintiffs' presentment for something the Vessel Defendants could have easily ascertained would go directly against the Seventh and Eleventh Circuit's FTCA "sum certain" precedent. Thus, Cheek Plaintiffs' presentments satisfied the OPA "sum certain" requirement.

The purpose of the OPA's presentment procedure further supports that Cheek Plaintiffs' presentment was sufficient. In Brown, 838 F.2d at 1160, the Eleventh Circuit explained that "[t]he congressional purposes of the [FTCA presentment] claim procedure are 'to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.'" Id. (quoting Adams, 615 F.2d at 288). The court continued, "[a] 'claim' is not synonymous with a 'legal cause of action.'" Id. at 1161. Thus, "[c]ompelling a claimant to advance all possible causes of action and legal theories is 'overly technical' and may frustrate the purpose of [the presentment procedure]." Id. (quoting Mellor v. United States, 484 F. Supp. 641, 642 (D. Utah 1978)).

Several courts have recognized that Congress crafted the OPA presentment procedure "to promote settlement and avoid

litigation," purposes very similar to those of the FTCA presentment procedure. Nguyen, 805 F.3d at 138 (quoting Johnson v. Colonial Pipeline Co., 830 F. Supp. 309, 310 (E.D. Va. 1993)); Abundiz v. Explorer Pipeline Co., No. Civ.A. 300CV2029H, 2003 WL 23096018, at *3 (N.D. Tex. Nov. 25, 2003); Gabarick, 2009 WL 102549, at *3; Turner v. Murphy Oil USA, Inc., No. CIV.A. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007); Marathon Pipe Line Co. v. LaRoche Indus. Inc., 944 F. Supp. 476, 479 (E.D. La. 1996). The OPA, like the FTCA, requires claimants to present *claims* prior to filing suit, and, as the Eleventh Circuit noted, "[a] 'claim' is not synonymous with a 'legal cause of action.'" Brown, 838 F.3d at 1061. Rejecting Cheek Plaintiffs' OPA cause of action simply because they did not label which damages they brought under OPA and which they did not—when ascertaining this information presented very little difficulty to the Vessel Defendants—would be "overly technical." Id. Holding claimants to such high standards "may frustrate the purpose" of the OPA presentment procedure by encouraging defendants to litigate a presentment's sufficiency rather than investigating the merit of the claimant's claims and seeking to reach a settlement. While "'vague notions' about a statute's overall purpose cannot be allowed 'to overcome the words of its text regarding the *specific* issue under consideration,'" as discussed, the OPA's text does not address the specific issue under consideration—what constitutes a "sum certain"—and relevant

persuasive precedent also supports that Cheek Plaintiffs'
presentments included "sum[s] certain[s]." Boca Ciega, 51 F.3d at
238 (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 261-62
(1993)).

Vessel Defendants cite Sunoco, 2022 WL 899524, at *3, and
Citgo, 574 F. Supp. 3d at 83-84, for the proposition that a
"claimant cannot present a lump sum amount which includes both OPA
and non-OPA damages." Dkt. No. 73 at 9. In Sunoco and Citgo, the
courts applied the Seventh Circuit's "facts plus a demand for
money" standard and found the plaintiffs' presentments inadequate.
Sunoco, 2022 WL 899524, at *2-3; Citgo, 574 F. Supp. 3d at 83-84.
The presentments failed to mention the "OPA anywhere in the
document" and "provide[d] a sum,  . . . [but] [d]id not indicate
how [the] sum would be allocated between the various types of
claims—CERCLA, OPA, and state law—that [the] [p]laintiff
assert[ed] against [the] [d]efendants." Sunoco, 2022 WL 899524, at
*3.

In contrast, Cheek Plaintiffs' presentments repeatedly
invoked the OPA. Dkt. No. 73-1 at 1, 3. As discussed, supra pp.
15-19, they also satisfied the "facts plus a demand for money"
standard. While the Sunoco and Citgo presentments did not
"indicate" how the sums were allocated, Cheek Plaintiffs'
presentments explained in detail how the sum was calculated and
provided more than enough detail to allow the Vessel Defendants to

22

conduct their own investigation and valuation. Dkt. No. 73-1 at 3. Thus, applying the same "facts plus a demand for money" standard that the courts used in Sunoco and Citgo results in a different outcome in this case.

Other cases where courts have found presentments lacking are similarly distinguishable. In Johnson, 830 F. Supp. at 311, the presentment "d[id] not give any suggestions as to the amount of damages [the plaintiffs were] claiming." See also Murphy Oil USA, 2007 WL 4208986, at *2 (holding that the plaintiffs' initial class action did not provide sufficient claim specificity to satisfy the OPA presentment requirement). Here, Cheek Plaintiffs' presentment claimed a specific amount of damages, provided corresponding monetary amounts for each type of damages sought, and explained how the sums were calculated. In Abundiz, 2002 WL 2030880, at *3-4, the court held that the plaintiffs "failed to allege a sum certain for the damages sustained by any of the [p]laintiffs" because the plaintiffs' stipulation and settlement offer contained different amounts. Id. at *4. "[T]he settlement offer [was] in excess of the stipulation," so the defendant "could not have negotiated meaningfully with the [p]laintiffs." Id. Here, Cheek Plaintiffs' presentments provided detail and uncontradicted monetary estimates such that the Vessel Defendants could have negotiated meaningfully. See generally Dkt. No. 77-1.

At bottom, Cheek Plaintiffs' presentments comport with the OPA's text, satisfy the Eleventh Circuit and Seventh Circuit FTCA "sum certain" standards, and are consistent with the OPA's purpose. Therefore, the Vessel Defendants' argument that the presentment is insufficient for presenting a lump sum with both OPA and non-OPA damages fails.

## B. Presentment of all claims

The Vessel Defendants next argue that Cheek Plaintiffs' presentments fail because they assert damages in the amended complaint that they do not raise in their presentments. Dkt. No. 73 at 9; Dkt. No. 85 at 5–6. Specifically, the Vessel Defendants argue that Cheek Plaintiffs seek to recover subsistence use damages and natural resource damages, which, according to the Vessel Defendants, Cheek Plaintiffs did not mention in their presentments. Id. The Vessel Defendants also note that some of the Cheek Plaintiffs failed to raise property damages because "only 6 out of 17 Plaintiffs included descriptions of property damage in their presentments." Id.

To begin, Cheek Plaintiffs assert that they "have never sought and are not seeking natural resources damages." Dkt. No. 77 at 16. However, the amended complaint references "natural resource" damages. See Dkt. No. 56 ¶¶ 101, 103–05, 108, 111–12 ("As a result of the oil spill, the Plaintiffs [have] not been able to use natural resources, such as the marshes, rivers, beaches,

estuaries, parks, fish, shrimp, crab, water and potentially other areas and spaces, that have become contaminated by the spilled oil and other contaminants, and Plaintiffs are entitled to recover from Defendants for such damages and loss of use." (citing 33 U.S.C. § 2702(b)(2))). Thus, the Court **GRANTS** the Vessel Defendants' motion to dismiss, dkt. no. 73, as to natural resource damages to the extent the amended complaint seeks to recover these damages. As a result, the Court need not address the Vessel Defendants' other arguments as to these damages. Dkt. No. 73 at 10–14.

The Court next evaluates Cheek Plaintiffs' claims for subsistence use damages and property damages. For the reasons discussed, supra pp. 18–21, a claimant need not specifically label each type of OPA damages sought. So long as the presentment "specifie[s]" "facts plus a demand for money," "the claim encompasses any cause of action fairly implicit in the facts." Sunoco, 2022 WL 899524, at *2 (quoting Khan, 808 F.3d at 1172–73); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808 F.3d at 1172–73). Thus, the Court must examine whether damages related to lost profits and earning capacity, as well as damages related to increased public services, are "fairly implicit" in the County's presentment. Id.

i. **Subsistence use damages**

Subsistence use damages are not "fairly implicit" in Cheek Plaintiffs' presentments. Id. Subsistence use damages are "[d]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources." 33 U.S.C. § 2702(C). These damages "relate[] to use of a natural resource, such as water, to obtain the minimum necessities for life." Petition of Cleveland Tankers, Inc., 791 F. Supp. 669, 678 & n.7 (E.D. Mich. 1992). Subsistence use does not include using a natural resource to conduct a business activity. See id. at 678 ("Contrary to the claimants' assertion, they did not use the river for 'subsistence use'—such term relates to use of a natural resource, such as water, to obtain the minimum necessities for life. The claimants seek to stretch the term well beyond its plain meaning to include as 'subsistence' any business activity." (footnote omitted)); Sekco Energy, Inc. v. M/V MARGARET CHOUEST, 820 F. Supp. 1008, 1015 (E.D. La. 1993) ("Plaintiff did not make 'subsistence use' of natural resources. . . . Rather than using natural resources in this manner, plaintiff had a commercial purpose in drilling for hydrocarbons.").

Cheek Plaintiffs argue, "[w]hile the business-entity Plaintiffs may not be able to recover subsistence use damages, the

individual plaintiffs did not have to spell it out that they eat fish and seafood from the coastal waters to properly assert a claim for subsistence use damages." Dkt. No. 77 at 17. While Cheek Plaintiffs did not have to specifically use the words "subsistence use damages," they did have to include facts in their presentments sufficient to make subsistence use damages "fairly implicit" in the presentment or to provide notice "sufficient to enable [the defendant] to investigate." Sunoco, 2022 WL 899524, at *2 (quoting Khan, 808 F.3d at 1172-73); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808 F.3d at 1172-73); Dalrymple, 460 F.3d at 1325 (quoting Suarez, 22 F.3d at 1066). Cheek Plaintiffs' presentments did not do so.

First, some of the presentments contain no indirect or direct references whatsoever to harvesting marine life. See, e.g., Dkt. No. 77-1 at 8-10 (claimant operated a kayak and paddleboard tour and rental company and a "concierge service"); id. at 24-26 (claimant operates an airboat tour company); id. at 27-29 (claimant operates a kayak and paddleboard tour and rental company). Second, even those presentments that mention harvesting marine life contain no facts relating to the claimant's subsistence use based on that harvest nor how and to what extent the wreck impacted their subsistence use. Id. at 2-7, 11-23, 30-40. Instead, these presentments contain facts and monetary values solely related to the wreck's impact on claimants' businesses, which are not

27

recoverable as subsistence use damages. Cleveland Tankers, 791 F.
Supp. at 678; Sekco Energy, 820 F. Supp. at 1015.

In Nguyen, 805 F.3d at 141, the court found the plaintiff
fishermen's presentment letters sufficient, including their claims
for subsistence use damages. In that case, the claimants'
presentment letters "stated that as a result of the pollution
discharge, the fishermen suffered losses in . . . subsistence use
of harvested sea life" and "alleged a loss of $60 per day in
subsistence use of natural resources." Id. at 136. The court held
that this information was sufficient to satisfy the presentment
requirement; the claimants did not have to provide additional
information such as "an explanation of how the $60 in subsistence
loss was calculated." Id. at 137, 141.

Unlike the plaintiffs in Nguyen, Cheek Plaintiffs'
presentments do not contain any facts indicating that the claimants
suffered subsistence use losses—or even a statement that they
suffered such losses, without further elaboration, such as the
Nguyen plaintiffs presented. Moreover, nowhere in Cheek
Plaintiffs' detailed explanations of the amount of damages sought
and how those damages were calculated do the presentments allude
to subsistence use damages. Under Nguyen, had Cheek Plaintiffs
merely stated that they suffered subsistence use damages and
attached a monetary value, they could have satisfied the
presentment requirement. Because Cheek Plaintiffs fail to satisfy

even this lenient standard, subsistence use damages were not
"fairly implicit" in their presentments nor did their presentments
provide notice "sufficient to enable [the defendant] to
investigate." Sunoco, 2022 WL 899524, at *2 (quoting Khan, 808
F.3d at 1172-73); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808
F.3d at 1172-73); Dalrymple, 460 F.3d at 1325 (quoting Suarez, 22
F.3d at 1066). Since Cheek Plaintiffs failed to present their
claims for subsistence use damages, they may not now assert them
in this litigation. Boca Ciega, 51 F.3d at 240 (holding that the
OPA presentment requirement is a mandatory condition precedent).[5]
Because Cheek Plaintiffs' subsistence use damages claims fail for
lack of presentment, the Court need not address the Vessel
Defendants' other arguments related to these damages. Dkt. No. 73
at 10-14. Thus, the Court **GRANTS** the Vessel Defendants' motion to
dismiss, dkt. no. 73, as to subsistence use damages under the OPA.

---

[5] As a separate ground for dismissal, Vessel Defendants argue that
the six juridical Plaintiffs in this case "cannot legally recover
subsistence use damages." Dkt. No. 73 at 10 (citations omitted).
As mentioned, "subsistence use" damages "relate[] to use of a
natural resource, such as water, to obtain the minimum necessities
for life." Petition of Cleveland Tankers, 791 F. Supp. at 678 &
n.7 (citing Webster's Ninth New Collegiate Dictionary, 1176
(1986)); Sekco Energy, 820 F. Supp. at 1015. The juridical-
Plaintiffs, as legal fictions created to operate business, do not
have "life" or the "necessities of life." Thus, Cheek Plaintiffs'
claim for subsistence use damages under the OPA also merits
dismissal on this ground as to its six juridical Plaintiffs.

**ii.  Property damages**

Vessel Defendants contend that the Court must dismiss property damages claims of eleven Plaintiffs who, they allege, failed to include "descriptions of property damage in their presentments." Dkt. No. 73 at 9. Vessel Defendants point to Plaintiffs (1) Charles Hicks; (2) Jamie Sanders; (3) Georgia Adventure Sports, LLC; (4) Rob Aldridge; (5) Southbound Expeditions, LLC f/k/a Hit N Run Fishing, LLC ("Southbound Expeditions"); (6) Robert Davis; (7) Island Airboat Tours, LLC; (8) Robert Williams; (9) Turtle Tides, LLC; (10) Timothy Dykes; and (11) Timothy Cheek. Id. at 9–10 n.5.

33 U.S.C. Section 2702(b)(2)(B) defines damages to real or personal property as "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property." Vessel Defendants are correct that the following Plaintiffs fail to mention or allude to property damages in their presentments: (1) Jamie Sanders, dkt. no. 77-1 at 8–10; (2) Georgia Adventure Sports, LLC, id.; (3) Robert Davis, id. at 24–26; (4) Island Airboat Tours, LLC, id.; (5) Robert Williams, id. at 27–29; (6) Turtle Tides, LLC, id.; (7) Timothy Dykes, id. at 34–36; and (8) Timothy Cheek, id. at 37–40. None of these presentments refer to or contain facts indicating "injury to" or "destruction of[] real or personal property." 33 U.S.C. § 2702(b)(2)(B). Without

even an allusion to whether or how their properties were damaged in their presentments, these Plaintiffs may not now seek to recover property damages in this suit. Sunoco, 2022 WL 899524, at *2 (quoting Khan, 808 F.3d at 1172–73); Citgo, 574 F. Supp. 3d at 83 ("All that must be specified is facts plus a demand for money; if those two things are specified, the claim encompasses any cause of action fairly implicit in the facts." (alterations accepted) (internal quotation marks omitted) (quoting Khan, 808 F.3d at 1172–73)); Brown, 838 F.2d at 1160 ("The FTCA's [presentment] requirement is satisfied if the claimant '(1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim.'" (quoting Adams, 615 F.2d at 289)).

However, Plaintiffs Rob Aldridge, Southbound Expeditions, LLC,[6] and Charles Hicks all included "descriptions of property damages in their presentments." Dkt. No. 73 at 9. Plaintiffs Rob Aldridge and Southbound Expeditions stated in their joint presentment:

> Claimant Aldridge has spent more than 30 hours scrubbing oil from the hull of his boat after attempting to navigate the areas near the vessel. He has also caught fish covered in oil and has had fish vomit or regurgitate oil on to his boat's deck. . . . Additional travel also increases the wear and tear on Claimant Aldridge's boats and accelerates depreciation.

---

[6] Plaintiff Aldridge owns Southbound Expeditions. Dkt. No. 56 ¶¶ 11–12.

31

Dkt. No. 77-1 at 21–22. Oil on the boat, fish vomit and regurgitated oil on the boat, and "wear and tear" on the boat, id., all qualify as "injury to . . . personal property." 33 U.S.C. § 2702(b)(2)(B). Thus, Plaintiffs Rob Aldridge and Southbound Expeditions, LLC, include "descriptions of property damage in their presentments." Dkt. No. 73 at 9.

Plaintiff Charles Hicks similarly mentions property damage in his presentment. He stated: "Claimant Hicks has had to scrub oil off his boat on at least one occasion." Dkt. No. 77-1 at 3. Oil on the boat qualifies as "injury to . . . personal property." 33 U.S.C. § 2702(b)(2)(B); cf. Nguyen, 805 F.3d at 136, 141 (presentment letter stating that "as a result of the pollution discharge, the fishermen suffered losses in . . . subsistence use of harvested sea life" was sufficient to claim subsistence use losses). Therefore, Plaintiffs Rob Aldridge, Southbound Expeditions, LLC, and Charles Hicks' claims for property damages under the OPA survive. The Court **GRANTS** the Vessel Defendants' motion to dismiss, dkt. no. 73, as to Plaintiffs Jamie Sanders, Georgia Adventure Sports, LLC, Robert Davis, Island Airboat Tours, LLC, Robert Williams, Turtle Tides, LLC, Timothy Dykes, and Timothy Cheek's claims for property damages under the OPA.

## II.  Displacement and preemption

While "'[p]reemption' and 'displacement' are often used interchangeably," they are distinct concepts. United States v. Am.

Com. Lines, LLC, 759 F.3d 420, 422 (5th Cir. 2014). Indeed, some
of the cases cited herein use these terms interchangeably.
"[P]reemption refers to whether federal statutory law supersedes
state law, while 'displacement' applies when . . . a federal
statute governs a question previously governed by federal common
law." Id. The Vessel Defendants' argument implicates displacement:
whether the OPA displaces Cheek Plaintiffs' federal maritime
claims. Dkt. No. 73 at 11-16 ("[Cheek Plaintiffs'] federal maritime
law claims are barred by preemption."). In contrast, Norton Lilly's
argument implicates both displacement and preemption: whether
federal law preempts Cheek Plaintiffs' state-law claims and
whether the OPA displaces federal maritime law.

**A. The Vessel Defendants**

The Vessel Defendants argue that the OPA displaces the Cheek
Plaintiffs' federal maritime claims. Dkt. No. 73 at 11-16. The
amended complaint asserts negligence under both federal maritime
law and Georgia state law, but it does not specify whether it
asserts claims for negligence per se, public nuisance, or trespass
under federal maritime or Georgia state law. Dkt. No. 56 ¶¶ 114-
57. These claims appear to be asserted under Georgia state law,
so, inferring in Cheek Plaintiffs' favor, the Court will treat
them as such. Dkt. No. 78 at 6-9 (mentioning claims for negligence
per se, public nuisance, and trespass in the context of discussing
their state law claims). Thus, the Court evaluates whether Cheek

Plaintiffs' federal maritime negligence claim is displaced. Because the OPA's "detailed scheme . . . [displaces] the general oil-removal remedies that might've been available under . . . the common law," Savage Services Corp. v. United States, 25 F.4th 925, 939 (11th Cir. 2022), the claim is displaced.

In Savage, the Eleventh Circuit examined whether the OPA was exclusive and—by extension—whether the plaintiffs could pursue removal costs and damages by bringing common-law admiralty claims under the Suits in Admiralty Act ("SAA"). 25 F.4th at 938. The court held the OPA was exclusive. Id. at 939. The court explained, "where Congress enacts a specific remedy when previous remedies were 'problematic,' the remedy provided is generally regarded as exclusive." Id. (alterations accepted) (quoting Hink v. United States, 550 U.S. 501, 506 (2007)). The court continued,

> And that's pretty much what happened here. In 1990, Congress enacted a detailed—and precisely drawn—statute that governed almost every aspect of an oil-spill cleanup. . . . Congress didn't draw up this carefully balanced design—a veritable super-structure of oil-cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself—incentives the previous regime had, in Congress's estimation, failed to drive home. *This detailed scheme thus preempts the general oil-removal remedies that might've been available under either the common law or the SAA*.

Id. (emphasis added).

Cheek Plaintiffs respond that "the holding in Savage Services is limited to sovereign immunity's interplay in oil spill

34

liability, and not whether the OPA preempts all maritime claims," citing the OPA's savings provision as support. Dkt. No. 77 at 18–19. The Cheek Plaintiffs are correct that *one of* the issues in Savage was "whether the OPA provided a waiver of sovereign immunity so that a claimant could pursue removal costs against the United States." 25 F.4th at 933–36. The court held that it did not. Id.

But the court did not end its analysis there. Next, the court examined whether the OPA was exclusive, such that, "even if the OPA may not *itself* contain a waiver of sovereign immunity, vessel owners may still go after the United States for removal costs and damages by bringing common-law admiralty claims against the Government pursuant to the SAA's sovereign-immunity waiver." Id. at 938. The court held that the OPA was exclusive, so the vessel owners could not pursue common-law admiralty claims against the Government. Id. at 938–44.

This holding is directly applicable to this case, where Cheek Plaintiffs—like the Savage claimants—seek to bring a common-law maritime claim for removal costs and damages against the Vessel Defendants. As the Savage court held, the OPA's "detailed scheme . . . preempts the general oil-removal remedies that might've been available under . . . the common law." Id. at 939. Because the Savage court held that "a federal statute governs a question previously governed by federal common law," it was using the word "preemption" interchangeably with the word "displacement." Am.

Com. Lines, LLC, 759 F.3d at 422. Thus, the Savage court held that the OPA displaces federal common-law oil removal remedies. Cheek Plaintiffs' federal maritime claims are therefore displaced by the OPA. Savage, 25 F.4th at 939; see also S. Port Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 65 (1st Cir. 2000) ("[W]e note that, although the parties have referred to this issue as one of 'preemption,' it does not present any of the federalism concerns normally associated with that word, because we are concerned only with the OPA's effect on preexisting *federal* law. The question, therefore, is not complicated by any 'presumption against preemption,' but is rather a straightforward inquiry into whether Congress intended the enactment of the OPA to supplant the existing general admiralty and maritime law, which allowed punitive damages under certain circumstances in the area of oil pollution. We conclude that Congress did so intend." (citations omitted)).

Cheek Plaintiffs respond that some of the damages they assert were caused by non-oil debris, such as vehicles and vehicle-parts. Dkt. No. 77 at 17–18. Plaintiffs argue that "[t]he damages sustained by Plaintiffs from the vessel's discharge of substances not within the OPA's definition of 'oil' are not contemplated, discussed, or provided for in the OPA, and therefore not preempted." Id.

Cheek Plaintiffs correctly note that debris such as cars and car parts do not fit within the OPA's definition of oil, which it defines as

> oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601) and which is subject to the provisions of that Act [42 U.S.C. § 9601 et seq.].

33 U.S.C. § 2701(23).

However, despite its name, the OPA provides for recovery of more than just oil removal and damages directly caused by oil discharge. The text shows this in three ways. 33 U.S.C. Section 2702(a) states: "each responsible party for a vessel . . . from which oil is discharged, or which poses the substantial threat of a discharge of oil, . . . is liable for the removal costs and damages specified in subsection (b) that result from such incident." Id.

First, the OPA provides for removal costs and damages that "result from such incident," not removal costs and damages caused by the oil discharge. Id. Thus, rather than limiting recovery solely to the "discharge of oil," the OPA uses broader language, expanding recovery to "costs and damages . . . that result from such an incident." 33 U.S.C. § 2702(a); In re Settoon Towing, LLC, 859 F.3d 340, 351 (5th Cir. 2017) ("[C]ourts cannot, without any

textual warrant, expand the operation of savings clauses to modify the scope of displacement under OPA." (quoting Am. Com. Lines, 759 F.3d at 426)). "Such incident" refers to a situation where a vessel discharges oil or there is a substantial threat that a vessel will discharge oil. 33 U.S.C. § 2702(a). As a result, the text covers more than simply recovery for damages directly attributed to oil, such as other damages caused by the incident which led to the discharge of oil or the substantial threat of oil discharge. And this makes sense considering that Congress intended the OPA to be a "detailed—and precisely drawn—statute [to] govern[] almost every aspect of an oil-spill cleanup," providing strict liability rather than dealing with the "fragmented collection of Federal and State laws providing inadequate cleanup and damage remedies." Savage, 25 F.4th at 930, 939 (quoting S. Rep. No. 101-94 at 3).

Second, under the plain language of the statute, the OPA adheres (1) when a vessel discharges oil, like the Golden Ray did in this case, or (2) when there is a "substantial threat of discharge of oil." Id. Thus, the OPA may adhere even when there is no oil discharge but only a substantial threat of oil discharge. Under Cheek Plaintiffs' logic, even though the OPA would adhere when there is a "substantial threat of discharge of oil," a claimant could not recover under the OPA because there would be no actual discharge of oil. In other words, it would render that part of Section 2702(a) superfluous. See Garcia v. Vanguard Car Rental

USA, Inc., 540 F.3d 1242, 1247 (11th Cir. 2008) ("Another pertinent canon is the presumption against surplusage: we strive to give effect to every word and provision in a statute when possible." (citing Lowery v. Ala. Power Co., 483 F.3d 1184, 1204 (11th Cir. 2007))).

Third, when the OPA adheres, it provides strict liability for all "removal costs and damages specified in subsection (b) that result from such incident." 33 U.S.C. § 2702(a). The "removal costs and damages specified in subsection (b)," id., are not limited to oil remediation and removal, id. § 2702(b).

The OPA covers "all removal costs incurred by the United States, a State, or an Indian tribe under subsection (c), (d), (e), or (l) of section 1321 of this title, under the Intervention on the High Seas Act (33 U.S.C. 1471 et seq.), or under State law" and "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan." Id. § 2702(b)(1); see also Matter of Complaint of Supreme Towing Co., Inc., No. CV 07-9231, 2010 WL 11561150, at *14 (E.D. La. Aug. 12, 2010) ("'The OPA imposes strict liability for pollution removal costs and damages' on 'responsible parties' *when there is a discharge of oil in navigable water*. Numerous courts have held that the OPA, where applicable, preempts the Limitation Act and general maritime law." (emphasis added) (citations omitted)). 33 U.S.C. Sections 1321(c), (d), (e), and (l) involve

39

the "removal of a discharge and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance," the preparation of a National Contingency Plan for removal of oil and hazardous substances, civil enforcement, and administration of the statutory section. "Hazardous substance" is defined as "any substance designated pursuant to subsection (b)(2) of this section." 33 U.S.C. § 1321(a)(14). Section (b)(2)(A) provides that "[t]he Administrator shall develop, promulgate, and revise as may be appropriate*, regulations designating as hazardous substances, other than oil as defined in this section*, such elements and compounds which, when discharged in any quantity into or upon the navigable waters of the United States . . . present an imminent and substantial danger to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, shorelines, and beaches." 33 U.S.C. § 1321(b)(2) (emphasis added). Thus, discharge of a "hazardous substance," a recoverable cost under Section 2702(b)(1), includes substances "other than oil." 33 U.S.C. § 1321(b)(2)(A).

The National Contingency Plan, similarly, permits removal of materials besides oil. 40 C.F.R. Section 300.415(b) states: "At any release, regardless of whether the site is included on the National Priorities List (NPL), where the lead agency makes the determination . . . that there is a threat to public health or welfare of the United States or the environment, the lead agency

may take any appropriate removal action to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of release."

Moreover, only one of the six delineated categories of OPA damages mentions damages "caused by a discharge of oil." Id. § 2702(b)(F) (defining public services damages as "[d]amages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, *caused by a discharge of oil*, which shall be recoverable by a State, or a political subdivision of a State" (emphasis added)). The other five categories make no mention of oil discharge, so they permit damages "result[ing] from [an] incident" where there was oil discharge or a threat of oil discharge, even if the damages themselves were not caused by the discharge of oil. 33 U.S.C. § 2702(a); id. §§ 2702(b)(A)-(E) (defining natural resource damages as "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage"; defining real or personal property damages as "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage"; defining subsistence use damages as "[d]amages for loss of subsistence use of natural resources"; defining revenues damages as "[d]amages equal to the net loss of taxes, royalties, rents, fees, or net

41

profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources"; defining profits and earning capacity as "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.").

Limiting recoverable damages to only those directly caused by oil discharge would also raise a plethora of issues. For example, it would raise claim- and litigation- costs for both the claimants and the responsible parties as further expert analysis would be required to determine whether certain damages were caused by oil discharge or some other discharge from the damaged vessel. Moreover, several discharges could have concurrent effects. For example, where natural resources such as local marine life are harmed by a wreck, it could be extremely difficult, if not nearly impossible, to precisely attribute how much the oil discharge damaged the local marine life versus how much discharge of car parts and other hazardous substances damaged the marine life. While this apportionment issue could possibly be resolved, it would undoubtedly complicate, elongate, and raise the expenses of OPA proceedings in a way that is not reflected by the text of the statute and does not serve to "promote settlement and avoid litigation." Nguyen, 805 F.3d at 138 (quoting Johnson, 830 F. Supp. at 310).

Thus, applying 33 U.S.C. Section 2702(a) to this case, the OPA covers damages from the non-oil debris Cheek Plaintiffs seek to recover. See Dkt. No. 85 at 10-11. The non-oil debris Cheek Plaintiffs mention in their amended complaint were discharged as a part of the Golden Ray wreck removal and threat mitigation efforts. In the amended complaint's factual allegations, Cheek Plaintiffs state: "in [an] *attempt to stabilize the wreckage*, Defendants caused over 6,000 tons of rocks to be dropped in the Sound and around the Golden Ray," dkt. no. 56 ¶ 76 (emphasis added); "[b]y December 12, 2019, approximately 320,000 gallons of fuel, mixed with water, were pumped out, and approximately 44,000 gallons of petroleum products, hazardous substances, and 4,200 cars *remained submerged* in local waters," id. ¶ 77 (emphasis added); "T&T's Wreck Removal Plan included the placement of an [EPB] that was intended to *contain pollutants from the vessel and mitigate the effects of potential discharges*," id. ¶ 82 (emphasis added); "T&T's Wreck Removal Plan alleged that the limited number of large cuts would reduce *the potential* of inaccessible and un-pumpable hydrocarbons and other pollutants from impacting the waters surrounding the wreck removal site," id. ¶ 83 (emphasis added); "the EPB would provide a protective barrier along the seabed, throughout the water column, and at the surface level *allowing for the retention and recovery of debris and other pollutants*," id. (emphasis added); "[r]epeated fires causing

43

additional discharges of debris and hazardous fluids occurred *throughout the duration of the wreck removal*," id. ¶ 88 (emphasis added); and "[t]he *salvage operations also caused numerous cars, car parts, and other debris* to fall into the Sound where many remain, while others were carried off in the currents," id. ¶ 91 (emphasis added). See also Dkt. No. 56 at 14 ("The [s]alvage [o]peration [c]aused [m]ultiple [f]ires and [o]n-[g]oing [o]il [s]pills, and [d]umped [c]ars, [c]ar [p]arts, and [d]ebris into the [s]ound."). Thus, Cheek Plaintiffs allege damages that "result from such incident"—an incident involving both "a vessel . . . from which oil [was] discharged" and which "pose[d] a substantial threat of discharge of oil." 33 U.S.C. § 2702(a). This is consistent with the Coast Guards' OPA-designated response to the wreck, which included recovery and remediation of non-oil debris. See Dkt. No. 24-5 at 2-29 (explaining that "pursuant to the requirements of OPA 90, and with the approval of the [Coast Guard], the Respondents have caused [Gallagher Marine Systems, LLC] to conduct daily operations, as described above, to address reports of releases of petroleum products and/or *chemicals and debris from the Golden Ray*" and discussing debris monitoring and remediation (emphasis added)); see also Speaker v. U.S. Dep't of Health & Human Serv. Ctrs. for Disease Control & Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010) (holding that documents outside the pleadings may be considered on a motion to dismiss if the documents are (1)

central to the plaintiff's claim and (2) their authenticity is undisputed). As a result, the damages from non-oil pollution and debris Cheek Plaintiffs claim are covered by the OPA, and the responsible parties are strictly liable for the removal costs and damages.

The OPA savings clause does not change this analysis. "It reads: 'Except as otherwise provided in this Act, this Act does not affect admiralty and maritime law.'" Id. (alteration accepted) (quoting 33 U.S.C. § 2751(e)). While Cheek Plaintiffs are correct that the OPA does not displace "all maritime claims," dkt. no. 77 at 18, 21, the savings clause does not mean that all federal common-law claims—in particular, those related to damages from oil discharge or substantial threats of discharge—survive. The court explained this in Savage in the context of claims against the United States:

> the fact is that the OPA *has* "provided otherwise." The OPA is a detailed and comprehensive framework for apportioning oil-spill liability. Through its many parts, Congress chose *not* to afford vessel owners any cause of action against the United States. Quite the contrary: It eliminated, as we've said, a provision—present in the OPA's predecessor statute—that would've allowed vessel owners to skirt liability in the case of governmental negligence. And it strayed from similar statutory schemes (like CERCLA and RCRA) that expressly allow for contribution claims against the federal government. The plain import of these unambiguous decisions, then, is that Congress *has* provided otherwise—by making clear that the Government is *not* liable for oil-removal costs.

Id.; see also Am. Com. Lines, 759 F.3d at 426 ("As OPA did
'otherwise provide[ ],' ACL's claims against ES & H and USES for
return of payments made by the Fund under OPA cannot be saved by
this clause. To interpret § 2751(e) as ACL proposes would be to
supersede OPA, and courts cannot, without any textual warrant,
expand the operation of savings clauses to modify the scope of
displacement under OPA." (citation omitted)); In re Settoon
Towing, 859 F.3d at 351 ("The . . . language [in the OPA savings
clause] shows that the admiralty claims that are preserved are
those that are not addressed in the OPA. . . . The contribution
that is being sought in this case is addressed in the OPA.
Marquette's view of the interplay between Section 2709 and Section
2751 would transform the 'savings clause' into a supremacy clause
by advancing general maritime law over the express provisions of
the OPA."); Gabarick v. Laurin Mar. (Am.) Inc., 623 F. Supp. 2d
741, 746 (E.D. La. 2009) (hereinafter Gabarick II) ("Claimants
refer to the savings provision as a basis for their argument that
OPA is a supplemental rather than exclusive avenue for the damages
it covers. However, Claimants' memoranda ignores the first part of
section (e)—'except as otherwise provided in this Act.' . . . The
Act also uses the absolute words 'all' and 'shall,' stating that
'all claims for . . . damages shall be presented first to the
responsible party,' and allows for suit after exhaustion of the
claims process as outlined in § 2713(c). 33 U.S.C. § 2713 (emphasis

46

added). Hence, the plain language of the statute indicates its mandatory and exclusive nature with respect to its covered damages.").

The OPA has similarly "provided otherwise" as to claims involving non-oil debris discharged by a vessel that discharged oil or which posed a substantial threat of oil discharge. 33 U.S.C. § 2702(a). The OPA provides claimants a pathway to hold responsible parties strictly liable for removal costs and damages "that result from such incident." 33 U.S.C. § 2702(a). Thus, because the OPA "*has* 'provided otherwise'" as to the damages Cheek Plaintiffs seek to recover under their federal maritime claims, the OPA displaces these claims.

Discussing the OPA, the Eleventh Circuit has commented, "Congress didn't draw up this carefully balanced design—a veritable super-structure of oil-cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself—incentives the previous regime had, in Congress's estimation, failed to drive home." Savage, 25 F.4th at 939. Plaintiffs benefit greatly from this regime—they can hold defendants strictly liable for damages—but they may not seek to recover twice for the same damages under both the OPA and federal common law. Thus, Cheek Plaintiffs' claim for federal maritime

negligence is displaced by the OPA and the Court **GRANTS** the Vessel Defendants' motion to dismiss as to this claim.[7]

### B. Norton Lilly

Norton Lilly argues all Cheek Plaintiffs' claims must be dismissed because (1) OPA displaces Cheek Plaintiffs' federal maritime claims and (2) federal maritime law preempts Cheek Plaintiffs' state-law claims. Dkt. No. 74 at 3–7. While Norton Lilly is correct as to the former argument, it is incorrect as to the latter.

### i.   Displacement

Cheek Plaintiffs assert claims for (1) negligence under federal maritime law and state law,[8] (2) negligence per se, (3) public nuisance, and (4) trespass against Norton Lilly. Dkt. No. 56 ¶¶ 114–57; <u>see also</u> Dkt. No. 78 at 6–9 (mentioning their claims

---

[7] To the extent Cheek Plaintiffs intended to assert their claims for negligence per se, public nuisance, and trespass under federal maritime law, these claims would be displaced by the OPA for the same reasons.

[8] Cheek Plaintiffs state in their brief that they "specifically asserted a negligence claim under maritime law and concluded by reserving state law claim 'where necessary' to supplement maritime law. Plaintiffs did not set forth a standalone state law negligence claim." Dkt. No. 78 at 6 (citing Dkt. No. 56 ¶ 115). According to Cheek Plaintiffs, they "included the reference to supplemental state law in the Complaint out of an abundance of caution in the event maritime jurisdiction does not attach to this negligence." <u>Id.</u> at 6–7. As discussed, <u>infra</u> pp. 51–56, maritime jurisdiction does attach to this negligence. Nevertheless, because Plaintiffs assert both causes of action in the amended complaint, the Court analyzes both maritime and state-law negligence as the causes of action applicable in this case.

for negligence per se, public nuisance, and trespass in the context of discussing their state law claims). Unlike the Vessel Defendants, Norton Lilly seeks dismissal of all Cheek Plaintiffs' claims. See generally Dkt. No. 74. As to Cheek Plaintiffs' claim for negligence under federal maritime law, this claim is displaced by the OPA for the same reasons as discussed supra, pp. 34–49.[9]

Cheek Plaintiffs, however, argue that "OPA liability extends only to the party designated as 'the responsible party.'" Dkt. No. 79 at 9 (citing 33 U.S.C. § 2702). Because Norton Lilly was not designated a "responsible party," Cheek Plaintiffs assert, they may bring federal and state maritime claims against Norton Lilly that the OPA would otherwise displace or preempt against a responsible party. Id. This argument fails.

As discussed, the OPA savings clause "reads: 'Except as otherwise provided in this Act, this Act does not affect admiralty and maritime law.'" Savage, 25 F.4th at 941 (alteration accepted) (quoting 33 U.S.C. § 2751(e)). And the OPA "has 'provided otherwise'" as to non-responsible parties for claims seeking to recover costs or damages resulting from a vessel discharging oil or posing a substantial threat of oil discharge. Savage, 25 F.4th at 941. "Through its many parts, Congress chose not to afford"

---

[9] Again, to the extent Cheek Plaintiffs intended to assert their claims for negligence per se, public nuisance, and trespass under federal maritime law, these claims would be displaced by the OPA for the same reasons.

claimants a cause of action against non-responsible parties. Id. Instead, it compensates claimants through strict liability against the responsible parties. 33 U.S.C. § 2702(a) The responsible parties, in turn, may seek recovery from non-responsible parties. See 33 U.S.C. §§ 2702(d)(1)(B), 2709. Because the OPA "has 'provided otherwise'" as to claims for costs and damages against non-responsible parties, the OPA displaces and preempts such claims as to non-responsible parties. Savage, 25 F.4th at 941. Therefore, Norton Lilly's motion to dismiss, dkt. no. 74, is **GRANTED** as to Cheek Plaintiffs' federal maritime law.

### ii.  Preemption

Norton Lilly argues that maritime law, not state law, governs Cheek Plaintiffs' claims. Dkt. No. 74 at 3–5. It is true that maritime law *could* govern Plaintiffs' claims against Norton Lilly. Dkt. No. 74 at 3–5. "To determine whether a claim falls under federal admiralty jurisdiction, the United States Supreme Court enunciated two tests, which address the location where the injury occurred and the incident's connection to maritime activity." Anderson v. United States, 317 F.3d 1235, 1237 (11th Cir. 2003) (citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995)); see also Dkt. No. 74 at 3–5 (arguing Cheek Plaintiffs' claims are governed by federal maritime jurisdiction). These tests are known as the "location" and "connection" test, respectively. Id.

> Under the location test, a court must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. Under the connection test, a court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

Id. (alterations accepted) (quoting Jerome B. Grubart, Inc., 513 U.S. at 534).[10]

---

[10] Cheek Plaintiffs argue that state law governs where "there is no federal maritime law" governing the cause of action. Dkt. No. 78 at 7-8. This misunderstands admiralty law. The "location" and "connection" test determine whether federal admiralty jurisdiction applies. Anderson, 317 F.3d at 1237 (quoting Jerome B. Grubart, 513 U.S. at 534). "[O]nce it is determined that the case involves a maritime tort, the case is governed by the substantive admiralty law. Courts have uniformly so held." Mink v. Genmar Indus., Inc., 29 F.3d 1543, 1548 (11th Cir. 1994) (first citing E. River S.S. Corp. v. Transam. Delaval, Inc., 476 U.S. 858, 862-66 (1986); and then citing Exec. Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 254 (1972)). "Indeed, the federal interest in uniformity is such that the courts have developed a reverse-Erie doctrine, by virtue of which the same federal maritime law applies in maritime cases, whether the case is brought in state court or in federal court based on diversity of jurisdiction." Id. As with other federal common law, "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." Coastal Fuels Mktg., Inc. v. Fla. Exp. Shipping Co., 207 F.3d 1247, 1251 (11th Cir. 2000) (collecting cases). This, however, does not mean that the claim is governed by state law instead of admiralty law. Rather, in applying admiralty law, the court may borrow state law principles. See Dkt. no. 88 at 3-4.

The "location" and "connection" tests are satisfied as to all Cheek Plaintiffs' state-law causes of action. First, the "location" test is satisfied because "the tort[s] occurred on navigable water." Anderson, 317 F.3d at 1237 (quoting Jerome B. Grubart, 513 U.S. at 534). "Under the locality test, the tort occurs 'where the alleged negligence took effect,' rather than where the negligent act was done." Harville v. Johns-Manville Prod. Corp., 731 F.2d 775, 782 (11th Cir. 1984) (citations omitted); see also Lanzi v. Yamaha Motor Corp., No. 8:17-CV-2020-T-36AEP, 2019 WL 10984163, at *3 (M.D. Fla. Oct. 8, 2019) (same); Chartis Prop. Cas. Co. v. Frenchman's Marina Resort, Ltd., No. 13-CV-80933, 2015 WL 12723104, at *4 (S.D. Fla. Jan. 16, 2015) ("Even though the acts giving rise to a tort may have occurred on land, under the locality test, in order to determine where the tort occurred, the court must still consider 'where the alleged negligence took effect,' rather than where the negligent act was done." (first quoting Exec. Jet, 409 U.S. at 266; and then citing In re Dearborn Marine Serv., Inc., 499 F.2d 263, 274 (5th Cir. 1974))); Sea Vessel, Inc. v. Reyes, 23 F.3d 345, 348 (11th Cir. 1994) ("[W]e must consider the situs of the fire (locality test) as well as the relationship between a fire on a vessel in dry dock undergoing routine repairs and traditional maritime activity (situs test) in order to determine whether this case is cognizable in admiralty."); Wilkins v. Com. Inv. Tr. Corp., 153 F.3d 1273, 1278 (11th Cir.

1998) ("Torts fall within maritime jurisdiction only if they occur or have effects on navigable water." (citing Jerome B. Grubart, 513 U.S. at 534)). "Hence, a tort 'occurs' at a maritime situs when a gun is fired from land into a boat on navigable waters, and when components of a ship's navigational system are negligently manufactured on land but cause a collision on the high seas." Harville, 731 F.2d at 782.

As for Cheek Plaintiffs' negligence claim, "the alleged negligence took effect" on navigable water because the Golden Ray capsized in the St. Simons Sound. Harville, 731 F.2d at 782; Dkt. No. 56 ¶ 121 ("As a result of Defendants' negligence, the vessel became unstable and listed dramatically, forcing the State Pilot in a split-second decision to run the Golden Ray into a sandbar to avoid a collision with an inbound vessel . . . and prevent shipwreck in deeper waters."). Even actions on land contributed to the capsize, such as when Norton Lilly's preload plan contained inaccurate data, the chief officer inaccurately input information into the LOADCOM computer, or the master of the Golden Ray did not review or verify the calculations, dkt. no. 56 ¶¶ 47-51, and "the tort occurred on navigable water" because "the alleged negligence took effect" on navigable water—the Golden Ray capsized there, id. ¶ 60; cf. Sisson v. Ruby, 497 U.S. 358, 361 (1990) ("[W]e refused to enter into a debate over whether the tort occurred where the plane had crashed and been destroyed (the navigable waters of Lake

Erie) or where it had struck the sea gulls (over land)." (citing Executive Jet, 409 U.S. at 266–67)); Harville, 731 F.2d at 782 ("Although the negligent acts and omissions that the plaintiffs in this case allege occurred on land, for purposes of the jurisdictional test the tort occurred where the plaintiffs were exposed to the asbestos that caused their injuries."); Ayers v. United States, 277 F.3d 821, 827 (6th Cir. 2002) ("To engage in . . . a debate [about whether the tort occurred on land because the lockmaster activated the mechanism to release the water on land] . . . would be to apply too mechanical an application of the locality test, something that the Supreme Court has recognized as neither 'sensible' nor 'consonant with the purposes of maritime law." (quoting Jerome B. Grubart, 513 U.S. at 533)). As a result, as Cheek Plaintiffs admit, the state-law negligence claim satisfies the "location" test. Dkt. No. 78 at 6.

The same logic applies to Cheek Plaintiffs' claims for public nuisance and trespass. The "alleged negligence took effect" on navigable waters because Defendants allegedly "obstruct[ed] navigable waters" by causing the vessel to capsize and mishandling the wreck removal. Dkt. No. 78 at 7–8 ("To be clear, Plaintiffs allege that Defendants created multiple public nuisances by obstructing navigable waters. . . . Similarly, Norton Lilly trespasses on Plaintiffs' property each and every time oil, car parts, and debris make contact with Plaintiffs' vessels and

equipment and interfere with their use."). Thus, Cheek Plaintiffs' tort claims for public nuisance and trespass "occur[ed] or [had] effects on navigable water." Wilkins, 153 F.3d at 1278 (citing Jerome B. Grubart, 513 U.S. at 534).

Second, the "connection" test is satisfied because the "activity giving rise to the incident" underlying all Cheek Plaintiffs' state-law claims was maritime shipping and thus maritime commerce, which has "a substantial relationship to traditional maritime activity." Id.; see also Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674 (1982) ("[T]he primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce.").

According to Norton Lilly, because Plaintiffs' claims satisfy the test for maritime jurisdiction, Plaintiffs plead maritime—not state law—claims, which are displaced by the OPA. Dkt. No. 74 at 3–5. However, Norton Lilly's conclusion rests on a false premise. Norton Lilly's argument presumes that maritime law, if it can apply, *must be exclusive*. Dkt. No. 74 at 3–5 ("Each of [P]laintiffs' claims is therefore governed by maritime law."). This is not how maritime law functions. Instead, maritime law and state law can act concurrently. See, e.g., Kossick v. United Fruit Co., 365 U.S. 731, 739 (1961) ("[T]he fact that maritime law is—in a special sense at least—federal law and therefore supreme by virtue of Article VI of the Constitution carries with it the

implication that wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant. *But the process is surely rather one of accommodation*, entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern." (emphasis added) (citation omitted)); Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 631 (1st Cir. 1994) ("We hold, then, that the Rhode Island's Compensation Act as reasonably construed and applied is not preempted by the admiralty clause of the Constitution."); Kodiak Island Borough v. Exxon Corp., 991 P.2d 757, 769 (Alaska 1999) ("Because the *Robins* rule is not a 'characteristic feature' of admiralty and the application of Alaska law will not unduly interfere with the harmony and uniformity of the admiralty system, we hold that federal law does not preempt enforcement of the damages provisions of Alaska's hazardous substances statutes."). Here, Cheek Plaintiffs' claims are properly pled under Georgia state law because the Golden Ray wreck occurred within Georgia's territorial waters. Dkt. No. 56 ¶¶ 1, 60 ("[T]he [Golden Ray] . . . capsized in the St. Simons Sound, off the coast of Georgia."); Dowis v. Mud Slingers, Inc., 621 S.E.2d 413, 415-16, 419 (Ga. 2005) (explaining that Georgia's choice of law for torts is "lex loci

delicti," which means "where the tort was committed"). Thus, the question becomes whether this is one of the cases where a plaintiff in an oil-spill case may assert both state and federal law claims, even though the state claims seem duplicative.

Courts and commentators have recognized that federal maritime preemption doctrine is difficult. See, e.g., Thomas J. Schoenbaum, Admiralty and Maritime Law, § 4:4 (6th ed.) ("The issue of federalism in admiralty and the scope of application of state law in maritime cases is one of the most perplexing issues in the law."); Steven R. Swanson, Federalism, the Admiralty, and Oil Spills, 27 J. Mar. L. & Com. 379, 379–80 (1996) ("The federalism issues created by civil damages suits brought by private litigants have received less attention than they deserve. The *Exxon Valdez* disaster showed that a major oil spill can implicate both federal and state laws. Plaintiffs claiming harm from the spill brought actions under state and federal law in both legal systems. The resulting liability questions centered on the interaction of federal general maritime law, federal statutory law, state common law, and state statutory law. This collection of remedies caused a great deal of confusion and controversy. After years of Congressional inaction, the magnitude of the problems presented in the *Exxon Valdez* case led to the passage of the [OPA] which continued to allow the application of state law *without fully clarifying how federal and state law were to interact*." (emphasis

57

added) (footnote omitted)); William R. Gignilliat, The Gulf Oil
Spill: OPA, State Law, and Maritime Preemption, 13 Vt. J. Envtl.
L. 385, 388 (2011) ("The doctrine [governing maritime preemption]
has not been applied clearly in the past."). As one court noted,
"[d]iscerning the law in this area is far from easy; one might
tack a sailboat into a fog bank with more confidence." Beach
Shellfish, 32 F.3d at 624. Instead, courts apply the Jensen[11] test
to determine whether maritime law preempts state law. See, e.g.,
Gignilliat, supra, at 409-15(discussing how the Jensen test could
apply during an oil spill); MBH Mar. Int. LLC v. Manteiga, No. 17-
61909-CIV, 2018 WL 1363844, at *5 (S.D. Fla. Mar. 15, 2018)
(explaining and applying the Jensen test).

    Caselaw analyzing when plaintiffs' state-law claims are
preempted in OPA cases have yielded different results and
rationales. See Gignilliat, supra, at 404-05; Sekco Energy, 820 F.
Supp. at 1013 (holding that federal maritime law preempted state
law because federal maritime law "applie[d] 'of its own force'"
(quoting Union Tex. Petroleum v. PLT Eng'g, 895 F.2d 1043, 1047
(5th Cir. 1990))); Williams v. Potomac Elec. Power Co., 115 F.
Supp. 2d 561, 565 (D. Md. 2000) (relying upon United States v.
Locke, 529 U.S. 89 (2000), to find that "OPA does not preempt
'state laws of a scope similar to the matters contained in Title

---

[11] S. Pac. Co. v. Jensen, 244 U.S. 205 (1917).

I of OPA,' such as the state common law actions pleaded here");
Dostie Dev., Inc. v. Arctic Peace Shipping, Co. Inc., No. 95-808-
CIV-J-MMP, 1996 WL 866119, at *3 (M.D. Fla. Aug. 14, 1996) (relying
upon 33 U.S.C. Section 2718(a)(2) to find that the OPA did not
preempt the plaintiffs' common law negligence claim); Nat'l
Shipping Co. of Saudi Arabia v. Moran Trade Corp. of Del., 122
F.3d 1062 (4th Cir. 1997) (holding that the OPA preempted state
law claims by a plaintiff who was initially designated the
responsible party to recover expenses against the third party that
was the sole cause of the spill); Isla Corp. v. Sundown Energy,
LP, No. CIV.A. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27,
2007) (finding no preemption by relying on a removal case, Tanguis
v. Westchester, 153 F. Supp. 2d 859, 863 (E.D. La. 2001), where
the court noted that a group of commentators observed "that the
OPA 'does not preempt state law in the area of oil spill liability
and compensation'"); Mid-Valley Pipeline Co. v. S.J. Louis Const.,
Inc., 847 F. Supp. 2d 982, 990 (E.D. Ky. 2012) (applying conflict
preemption analysis and holding that the OPA preempted the
plaintiff's state-law claim for indemnification because it
conflicted with the OPA but that the OPA did not preempt the
plaintiff's contribution claim because it did not conflict); see
also In re Deepwater Horizon, 745 F.3d 157, 171 (5th Cir. 2014)
(analyzing preemption of state-law claims under the OPA and CWA
and holding that "[f]ederal law, the law of the point source,

exclusively applies to the claims generated by the oil spill in any affected state or locality, [but] [p]reemption is limited to situations in which the affected state is not the point source jurisdiction; affected states may still pursue relief based on the OPA and the CWA or the law of the point-source"); In re Oil Spill by Oil Rig DEEPWATER HORIZON the Gulf of Mexico, on Apr. 20, 2010, No. 10-3059, 2011 WL 5520295, at *8 (E.D. La. Nov. 14, 2011) (state law claims related to an oil spill that occurred outside of state territorial waters were preempted under the OPA and CWA).

At first glance, the resolution of the issue in this case seems clear. See, e.g., Dkt. No. 78 at 11–12 ("The OPA, by its terms, preserves state law claims."); Cynthia M. Wilkinson et. al., Slick Work: An Analysis of the Oil Pollution Act of 1990, 12 J. Energy Nat. Resources & Envtl. L. 181, 221 (1992) ("[T]he OPA explicitly does not preempt state law in the area of oil spill liability and compensation."). 33 U.S.C. Section 2718(a) provides:

Nothing in this Act or the Act of March 3, 1851 shall—

(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

(A) the discharge of oil or other pollution by oil within such State; or

(B) any removal activities in connection with such a discharge; or

(2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any

person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

But Norton Lilly's argument—framing the issue as one of state law preemption by federal maritime common law rather than the OPA itself—raises pertinent questions. By not "affect[ing]" the authority of states or modifying liabilities, the OPA could have preserved the authority of the states as it was before its enactment—that is, courts should apply Jensen and other preemption analyses to determine whether a plaintiff's state-law claims are preempted by federal maritime law, which, in turn, the OPA displaces. Cf. Wilkinson et al., supra, at 222–23 ("While attempts were made during negotiations to include language that specified what areas were preempted and what areas were not, the Senate was leery of doing so."). Or, as in Mid-Valley Pipeline, 874 F. Supp. 2d at 990, the OPA may still impliedly preempt state law that provides conflicting remedies and liability for oil pollution. Or, 33 U.S.C. Section 2718(a) removes the Jensen test or other preemption tests from the analysis, permitting *any* state common law claims that also impose liability for oil spills. These different interpretations explain the different analyses courts have conducted regarding this issue. Compare Williams, 115 F. Supp. 2d at 565 and Dostie Dev., 1996 WL 866119, at *3, with Sekco Energy, 820 F. Supp. at 1013 and Mid-Valley Pipeline, 847 F. Supp. 2d at 990.

Given the text of 33 U.S.C. Section 2718(a), persuasive authority, and indications of Congressional intent, the Court follows the latter analysis and finds that Section 2718(a) permits Cheek Plaintiffs' state-law claims. As noted, the phrase "[n]othing in this Act . . . shall . . . affect," as used in Section 2718(a), is subject to multiple interpretations—that is, (1) to not change from what it was prior to the OPA's enactment, retaining the status quo, or (2) to remove any impediments. Given that Section 2718(a) expressly mentions "imposing . . . *additional liability*" and "obligations or liabilities under . . . State law, *including common law*" and the state common law causes of action in this case would impose additional liability, the second interpretation seems most likely. Moreover, that Congress chose to include not only the word "affect" but also "construed or interpreted as preempting" or "construed or interpreted to affect or modify in any way" indicates a strong intent to preserve duplicative or overlapping state law, including state common law, causes of action. See also Wilkinson et. al., supra, at 222–23 ("Section [2718] of the OPA makes clear that states may impose additional requirements regarding oil spill liability, removal activities, penalties and fines, and oil spill trust funds.").

United States v. Locke supports this. 229 U.S. at 104–06. In Locke, the Supreme Court held that Washington's regulations governing the operation of oil tankers were preempted by federal

law, reasoning that the OPA's savings clauses "may preserve a State's ability to enact laws of a scope similar to Title I, but do not extend to subjects addressed in the other titles of the Act or other acts." Id. The Court explained, "[i]n contrast to the Washington rules at issue . . . , Title I does not regulate vessel operation, design, or manning." Id. at 105. It concluded, "[t]he evident purpose of the savings clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills." Id. "Our view of [the] OPA's savings clauses preserves this important role for States, which is unchallenged here." Id. at 106. Thus, while the Court's decision involved laws outside of Title I's scope, the Court strongly suggested that the OPA's savings clauses preserved state laws "of a similar scope to Title I," which imposes liability related to oil discharge or threats of oil discharge. Section 2718(a)(2) clarifies that "state law" includes "common law," such as the causes of action in this case. Other OPA cases that considered whether a plaintiff may bring state-law liability claims have also adopted this view. See Williams, 115 F. Supp. 2d at 565; Dostie Dev., 1996 WL 866119, at *3; Isla Corp, 2007 WL 1240212, at *2; see also Gignilliat, supra, at 406; Wilkinson et al., supra, at 221.

Importantly, this does not prevent other federal statutes, such as the CWA, from preempting state-law claims imposing additional liability for oil discharge or threats of oil discharge. Cf. In re Deepwater Horizon, 745 F.3d at 172–73 ("[T]he OPA was designed to complement, not compete with the CWA. That the OPA was enacted more recently than the CWA means little where there is no fundamental conflict with provisions of the CWA. The statutes, in other words, must be construed, as the district court noted, in *pari materia. . . .* Thus, while Section 2718(c) saves from the OPA's diminution the ability of the United States or state entities to impose requirements relating to oil discharges, it does not save those powers from the effects of the CWA or any other non-identified federal law."). However, no CWA claim is before the Court, and neither party argues that the CWA or another federal statute impacts preemption in this case, so the Court will not address that issue. Thus, as the case currently stands before the Court, Cheek Plaintiffs' state law claims are not preempted because 33 U.S.C. Section 2718(a) permits their state law claims.

### III. State law claims

Norton Lilly argues that, even if maritime law and the OPA do not preempt Cheek Plaintiffs' state law claims, these claims fail on the merits. Dkt. No. 74 at 9–19. When evaluating a motion to dismiss, the Court must "accept all factual allegations in a complaint as true[,] and take them in the light most favorable to

[the] plaintiff[.]" <u>Dusek v. JPMorgan Chase & Co.</u>, 832 F.3d 1243, 1246 (11th Cir. 2016). "Legal conclusions without adequate factual support are entitled to no assumption of truth," and a motion to dismiss "is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" <u>Id.</u> (alterations accepted) (first citing <u>Mamani v. Berzain</u>, 654 F.3d 1148, 1153 (11th Cir. 2011); and then quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). Cheek Plaintiffs' state law claims are properly pled.

**A. Negligence**

According to Norton Lilly, Cheek Plaintiffs' negligence claim fails because Norton Lilly (1) did not owe a duty to Plaintiffs and (2) did not proximately cause the Golden Ray to capsize. Dkt. No. 74 at 9–13.

Cheek Plaintiffs sufficiently allege that Norton Lilly owed them a duty. A "legal duty is the obligation to conform to a standard of conduct under the law for the protection of others against unreasonable risks of harm." <u>Rasnick v. Krishna Hosp., Inc.</u>, 713 S.E.2d 835, 837 (Ga. 2011). Cheek Plaintiffs allege that Norton Lilly had various responsibilities while acting as the Golden Ray's agent at the Port of Brunswick.  Dkt. No. 56 ¶¶ 39–45. This included "port services and logistics" for "loading and securing of [the vessel's] cargo," "proficiently securing the

cargo for the voyage," "securing of cargo and vessel loading and discharge of cargo," and "develop[ing] a preliminary load plan." Id. Cheek Plaintiffs also allege: "At all times material hereto, Defendants owed a duty to exercise reasonable care in the operation of the Golden Ray, including loading the vessel such that it would not capsize and wreck." Dkt. No. 56 ¶ 117. Thus, Cheek Plaintiffs properly allege that Norton Lilly owed them a duty in performing their vessel responsibilities. That Plaintiffs allege that the other Defendants who owned, chartered, crewed, or operated the Golden Ray also owe a duty to them does not negate this. Whether there were contractual provisions governing allocation of the duty or whether Cheek Plaintiffs were foreseeable victims given the other Defendants' duties to review the load plan and load and ballast the boat are questions that should be left for discovery.

Similarly, Cheek Plaintiffs sufficiently allege proximate cause, and Norton Lilly's argument regarding proximate cause should be left for summary judgment. Norton Lilly argues that there cannot be proximate cause between its actions and the injury because the other Defendants' negligence were independent, intervening acts or omissions "which w[ere] not foreseeable by [Norton Lilly,] w[ere] not triggered by [Norton Lilly's] act, and which w[ere] sufficient of itself to cause the injury." Dkt. No. 74 at 12–13 (quoting Pruette v. Phoebe Putney Mem'l Hosp., 671 S.E.2d 844, 850 (Ga. Ct. App. 2008)). Cheek Plaintiffs allege:

"Due to inaccurate data from Norton Lilly's preload plan and the chief officer's inaccurate manual IMACS inputs, the LOADCOM computer did not calculate the vessel's vertical center of gravity prior to the vessel's departure from the Port of Brunswick and thereby the Golden Ray failed to meet stability requirements for operation," dkt. no. 56 ¶ 49; "Defendants' acts and omissions . . . were caused by joint negligence," id. ¶ 120; and, "[a]s a result of Defendants' negligence, the vessel became unstable and listed dramatically," resulting in the Golden Ray's capsize, id. ¶ 121. Accepting Cheek Plaintiffs' factual allegations as true, Norton Lilly's inaccurate data caused the Golden Ray's instability and subsequent capsize. Drawing inferences in favor of Plaintiffs, as the Court must do at this stage, Norton Lilly was jointly negligent with the chief officer, it was foreseeable that the other Defendants would also commit negligent acts, or the acts were not "independent," "intervening," or "sufficient" to cause the injury. Pruette, 671 S.E.2d at 850. Cheek Plaintiffs have adequately pled proximate cause, and discovery will elucidate whether proximate cause actually existed based on the specific evidence in the case. See Ontario Sewing Mach. Co. v. Smith, 572 S.E.2d 533, 536 (Ga. 2002) ("[I]t is axiomatic that questions regarding proximate cause are 'undeniably a jury question' and may only be determined by the courts 'in plain and undisputed cases.'" (quoting Atlanta

Obstetrics & Gynecology Grp. v. Coleman, 398 S.E.2d 16 (Ga. 1990))).

Norton Lilly also argues that Cheek Plaintiffs' allegation of "inaccurate data" is vague and conclusory because Cheek Plaintiffs "do[] not identify any data that was allegedly inaccurate or articulate how it could have prevented the ship's computer from calculating the correct center of gravity." Dkt. No. 74 at 13. This is, in essence, a factual dispute. Cheek Plaintiffs alleged: "Due to inaccurate data from Norton Lilly's preload plan and the chief officer's inaccurate manual IMACS inputs, the LOADCOM computer did not calculate the vessel's vertical center of gravity prior to the vessel's departure from the Port of Brunswick and thereby the Golden Ray failed to meet stability requirements for operation." Dkt. No. 56 ¶ 49. This allegation is not conclusory—it explains that Norton Lilly's inaccurate data caused the Golden Ray's instability, which is entitled to the presumption of truth. In discovery, the parties can present evidence to determine whether the computer "did not calculate the vessel's vertical center of gravity" due to the preload plan. On a motion to dismiss, however, Plaintiffs' factual allegations are treated as true. Therefore, Cheek Plaintiffs state a claim for state-law negligence. As a result, Norton Lilly's motion to dismiss, dkt. no. 74, is **DENIED** as to this cause of action.

**B. Negligence per se**

Norton Lilly urges the Court to dismiss Cheek Plaintiffs' negligence per se cause of action because Plaintiffs dismissed their underlying causes of action for violations of the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA"). Dkt. No. 74 at 13–14. Cheek Plaintiffs admit that they "have dismissed the underlying [CWA] and [RCRA] claims." Dkt. No. 78 at 19. Cheek Plaintiffs "ask the Court to reserve ruling on their negligence per se claim" until they "refile[] [the CWA and RCRA claims] after service of the appropriate notice letters is perfected and the waiting period elapses." Id. at 19–20. These arguments overlook the components of a negligence cause of action.

A negligence per se claim *is a negligence claim*, where violation of a statute is per se evidence that the defendant acted below the standard of care. See, e.g., Handberry v. Manning Forestry Servs., LLC, 836 S.E.2d 545, 548 (Ga. Ct. App. 2019). For a violation of a statute to be per se evidence of negligence, (1) the injured party must fall within the class of persons the statute was intended to protect, and (2) the harm complained of must be the harm against which the statute was intended to guard. See, e.g., Rockefeller v. Kaiser Found. Health Plan of Ga., 554 S.E.2d 623, 626 (Ga. Ct. App. 2001). Here, Cheek Plaintiffs allege: "Defendants' past and ongoing discharge of oil and other pollutants, and dumping of cars, car parts, and related materials

69

and debris from the Golden Ray and subsequent salvage operations into the Sound and surrounding environment violated and continue to violate several statutes, including sections 301 and 402 of the CWA as well as the RCRA" and "[t]he harm to Plaintiffs is the type of harm the statutes were designed to guard against, and Plaintiffs fall within the class of persons these statutes were intended to protect." Dkt. No. 56 ¶¶ 125-29. Plaintiffs also allege that Defendants breached their duties owed to Plaintiffs and that violation of the statutes were the direct and proximate cause of Plaintiffs' damages. Id. Thus, Cheek Plaintiffs have adequately pled negligence per se, despite not alleging underlying CWA and RCRA claims. Again, negligence per se is a *type* of negligence claim where a plaintiff may prevail by showing an applicable statutory violation. Although Cheek Plaintiffs plead negligence per se and a separate negligence claim, id. ¶¶ 114-29, both claims allege the tort of *negligence*. Because Cheek Plaintiffs properly pled their cause of action, Norton Lilly's motion to dismiss, dkt. no. 74, is **DENIED** as to negligence per se.

### C. Public nuisance

Norton Lilly argues that Cheek Plaintiffs' public nuisance cause of action fails because (1) "no private property owned by . . . [P]laintiffs have been damaged" and (2) Norton Lilly did not have control over the nuisance. Dkt. No. 74 at 14-19.

First, a claim for public nuisance, by its nature, does not require damage to a plaintiff's private property. "A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." O.C.G.A. § 41-1-2.  "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance." City of Coll. Park v. 2600 Camp Creek, LLC, 666 S.E.2d 607, 608 (Ga. Ct. App. 2008) (quoting OCGA § 41-1-1). "In addition, a public nuisance requires 'some act or omission which obstructs or causes inconvenience to the public in the exercise of rights common to all.'" Id. (quoting Cox v. DeJarnette, 123 S.E.2d 16 (Ga. Ct. App. 1961)).

Second, Cheek Plaintiffs allege that Norton Lilly had control over the nuisance. As both parties recognize, "the essential element of nuisance is control over the *cause* of the harm." Fielder v. Rice Const. Co., 522 S.E.2d 13, 16 (Ga. Ct. App. 1999) (emphasis added); Dkt. No. 74 at 14; Dkt. No. 78 at 20–22. However, there may be multiple causes of a single harm; "[t]he tortfeasor must be either the cause or *a concurrent cause of the creation,* continuance, or maintenance of the nuisance." Fielder, 522 S.E.2d at 16 (emphasis added); Sanders v. Henry Cnty., 484 F. App'x 395, 399 (11th Cir. 2012). Cheek Plaintiffs allege that Norton Lilly, tasked with creating the preload plan, executed a deficient plan

that contributed to the Golden Ray capsize. Dkt. No. 59 ¶¶ 42–45, 49, 67, 69–71, 132–34. Drawing inferences in favor of Cheek Plaintiffs, Norton Lilly was the cause or a concurrent cause of the creation of the nuisance. Whether Norton Lilly truly was the cause or a concurrent cause is an issue for discovery. At this stage in the case, however, Cheek Plaintiffs state a claim for public nuisance.

Norton Lilly quotes City of Macon v. Roy, 130 S.E. 700, 702 (Ga. 1925), to show that "even if a defendant's negligence causes another to create a nuisance, it does not render the negligent defendant liable for nuisance." Dkt. No. 74 at 15. The quote reads:

> Negligence is not even a necessary ingredient of a cause of action growing out of a nuisance. A nuisance may arise through acts and conduct done within the pale of the law and executed with due care; and yet if the result attained injures the property or individual rights of another by causing a nuisance, the maintainer must either abate the nuisance or else respond in damages.

Id. (quoting Roy, 130 S.E. at 702); see also McLendon & Cox v. Roberts, 398 S.E.2d 579, 579 (Ga. Ct. App. 1990) ("[N]egligence is not always a necessary element of a cause of action for nuisance." (citing City of Macon v. Cannon, 79 S.E.2d 816 (Ga. 1954))).

This quote explains that negligence is not necessary to bring a nuisance claim, rather, a defendant may have acted legally and with the proper level of care and still cause a nuisance. While negligence is not required to bring a nuisance claim, this does not mean that negligence precludes a nuisance claim.

Norton Lilly further argues that Cheek Plaintiffs' allegations give rise only to a negligence cause of action rather than one for nuisance. Dkt. No. 74 at 15. Georgia courts have recognized that "[t]here is general agreement that nuisance is incapable of any exact or comprehensive definition." Fielder, 522 S.E.2d at 16 (quoting Cox, 123 S.E.2d at 24). "In general . . . the owner of the property from which the nuisance emanates is the proper defendant in an action for damages flowing from the creation or maintenance of a nuisance." McLendon & Cox, 398 S.E.2d at 579. This makes sense because nuisance cases typically involve nuisance emanating from real property, where the owner of the property has substantial control over the creation and maintenance of the nuisance. This case is different because it involves nuisance emanating from a shipwreck and involves several parties exercising substantial control over the property that emanated the nuisance—the owner of a large shipping vessel, such as in this case, often delegates control over aspects of the vessel and shipping to several parties. Drawing inferences in favor of Plaintiffs, Norton Lilly exercised substantial control over the "loading and securing of [the Golden Ray's] cargo." Dkt. No. 56 ¶¶ 39–45 (Norton Lilly was responsible for "port services and logistics" for "loading and securing of [the vessel's] cargo," "proficiently securing the cargo for the voyage," "securing of cargo and vessel loading and discharge of cargo," and "develop[ing] a preliminary load plan").

Improper loading of the cargo caused the vessel to be top-heavy and in danger of capsizing. Id. ¶ 70-71. Although "[t]he chief officer of the Golden Ray reviewed Norton Lilly's preload plan," drawing inferences in favor of Plaintiffs, Norton Lilly still retained substantial control over the plan considering it also created a "final load plan." Id. ¶¶ 46, 69; cf. Fielder, 522 S.E.2d at 17 (plaintiff permitted to bring claim against the health department, which approved the plan to use a septic tank, and the builder/developer). Discovery will clarify whether Norton Lilly in fact exercised enough control over the loading and securing of the vessel's cargo to support a public nuisance claim. Therefore, Norton Lilly's motion to dismiss, dkt. no. 74, is **DENIED** as to Cheek Plaintiffs' public nuisance claim.

### D. Trespass

According to Norton Lilly, Cheek Plaintiffs' trespass claim fails because "[P]laintiffs do not allege that Norton Lilly to[ok] any step with the knowledge that intermeddling with their chattel would result." Dkt. No. 74 at 16. In making this argument, Norton Lilly assumes that maritime law applies to this claim and applies the maritime standard. Id. at 15-16. As discussed, supra pp. 62-66, however, Georgia state law applies.

"In Georgia, '"[t]respass" means any misfeasance, transgression, or offense which damages another's health, reputation, or property.'" Plantation at Bay Creek Homeowners

Ass'n, Inc. v. Glasier, 825 S.E.2d 542, 549 (Ga. Ct. App. 2019)
(quoting O.C.G.A. § 1-3-3(20)). O.C.G.A. Section 51-10-3 provides,
"Any unlawful abuse of or damage done to the personal property of
another constitutes a trespass for which damages may be recovered."
Here, Cheek Plaintiffs allege that Norton Lilly unlawfully damaged
their personal property. Dkt. No. 56 ¶ 152 ("Defendants' activities
caused the vessel's capsizing and the discharging of fuel, oil,
cars, car parts, materials, debris, and other hazardous fluids
into the Sound and surrounding waterways, thereby damaging
Plaintiffs personal property, including their vessels, mechanical
systems, and equipment."). Norton Lilly "fails to cite to a Georgia
case where a scienter requirement has been imposed as a
prerequisite for a claim for trespass to personalty" such that a
defendant must intend to commit trespass to personalty rather than
to intend to commit the act that led to the trespass. Bowen v.
Porsche Cars, N.A., Inc., 561 F. Supp. 3d 1362, 1376 (N.D. Ga.
2021). Thus, because Cheek Plaintiffs allege "damage done to the
personal property of another," they state a claim for trespass to
personalty. O.C.G.A. § 51-10-3. Norton Lilly's motion to dismiss,
dkt. no. 74, is therefore **DENIED** as to Cheek Plaintiffs' trespass
claim.

## IV.   Punitive damages and attorney's fees

Norton Lilly also seeks dismissal of Cheek Plaintiffs' claims for punitive damages and attorney's fees. Dkt. No. 74 at 8–9, 16–18.[12]

> In Georgia, when the tortious conduct amounts to "wil[l]ful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences[,]" punitive damages are allowed pursuant to OCGA § 51-12-5 to deter the wrongdoer from repeating his wrongful acts. Punitive damages cannot be imposed without a finding of some form of culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage award.

Colonial Pipeline Co. v. Brown, 365 S.E.2d 827, 830 (Ga. 1988).

Cheek Plaintiffs allege: they "have repeatedly asked Defendants over the past year to cease their actions and clean up the Sound and surrounding environment, but Defendants have failed to take effective and appropriate action to remedy the situation and the ongoing discharges;" "Defendants' actions and inaction show willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which raises the presumption of conscious indifference to the consequences of such actions;" and "Defendants have acted and failed to act with the specific intent

---

[12] Because Cheek Plaintiffs' maritime negligence claim is dismissed, the Court need not address whether Plaintiffs may recover punitive damages under federal maritime law. See Dkt. No. 74 at 8–9 (arguing that Plaintiffs could not recover punitive damages under maritime law).

to cause harm to Plaintiffs and their use and enjoyment of the Sound and surrounding environment such that there is no cap on the amount of punitive damages that a jury may impose in this case." Dkt. No. 56 ¶¶ 170–72. This, in conjunction with Cheek Plaintiffs' allegations that Defendants have created a continuing public nuisance, sufficiently alleges willful misconduct. Thus, Cheek Plaintiffs' allegations support a claim for punitive damages.

O.C.G.A. § 13-6-11 permits recovery of expenses of litigation, including attorney fees, "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." "Bad faith warranting an award of attorney fees must arise out of the transaction on which the cause of action is predicated, and it may be found in how the defendant acted in his dealing with the plaintiff." Foxchase, LLLP v. Cliatt, 562 S.E.2d 221, 223 (Ga. Ct. App. 2002).

> Bad faith requires more than bad judgment or negligence, rather the statute imports a dishonest purpose or some moral obliquity and implies conscious doing of wrong and a breach of known duty through some motive of interest of ill will. Questions concerning bad faith under this statute are generally for the jury to decide, and the trial court may grant judgment as a matter of law on such issues only in the rare case where there is absolutely no evidence to support the award of expenses of litigation. Even slight evidence of bad faith can be enough to create an issue for the jury.

Kin Chun Chung v. JPMorgan Chase Bank, N.A., 975 F. Supp. 2d 1333, 1351 (N.D. Ga. 2013) (citations omitted) (internal quotation marks omitted).

Here, Cheek Plaintiffs allege that Defendants acted in bad faith by "fail[ing] to take effective and appropriate action to remedy the situation and the ongoing damages." Dkt. No. 56 ¶¶ 174–75.  Drawing inferences in favor of Plaintiffs, this implies a "breach of known duty through some motive of interest of ill will." Kin Chun Chung, 975 F. Supp. 2d at 1351. Thus, Norton Lilly's motion to dismiss, dkt. no. 74, is **DENIED** as to punitive damages and attorney's fees.

### CONCLUSION

Cheek Plaintiffs properly presented their OPA claims to the Vessel Defendants. Because Cheek Plaintiffs concede that they do not seek natural resource damages, the Vessel Defendants' motion to dismiss, dkt. no. 73, is **GRANTED** as to natural resource damages under the OPA, to the extent the amended complaint asserts such claims. Because Cheek Plaintiffs' presentments did not include claims for subsistence use damages, the Vessel Defendants' motion to dismiss, id., is **GRANTED** as to subsistence use damages under the OPA. Because Plaintiffs Jamie Sanders, Georgia Adventure Sports, LLC, Robert Davis, Island Airboat Tours, LLC, Robert Williams, Turtle Tides, LLC, Timothy Dykes, and Timothy Cheek,

Jr., did not present claims for property damages under the OPA, the Vessel Defendants' motion to dismiss, id., is **GRANTED** as to these Plaintiffs' claims for property damages under the OPA. Plaintiffs Charles Hicks, Greg Hildreth, Jeffrey Stokes, Kevin Dezern, Georgia Saltwater Adventures, LLC, Rob Aldridge, Southbound Expeditions, LLC f/k/a/ Hit N Run Fishing, LLC, Scott Owns, and Owens Management, LLC's OPA property damages claims remain pending. The Vessel Defendants' motion to dismiss, id., is otherwise **DENIED** as to Cheek Plaintiffs' OPA claim.

Since the OPA displaces Cheek Plaintiffs' federal maritime negligence claim against the Vessel Defendants, the Vessel Defendants' motion to dismiss, id., is **GRANTED** as to that claim. As the Vessel Defendants do not seek dismissal of Cheek Plaintiffs' state-law claims, these claims remain pending.

Similarly, Cheek Plaintiffs' federal maritime negligence claim against Norton Lilly is displaced by the OPA. Thus, Norton Lilly's motion to dismiss, dkt. no. 74, is **GRANTED** as to Cheek Plaintiffs' federal maritime negligence claim. Cheek Plaintiffs' state-law causes of action for negligence, negligence per se, public nuisance, and trespass against Norton Lilly are not preempted, and Cheek Plaintiffs' allegations sufficiently state a claim as to each of these causes of action. Thus, Norton Lilly's motion to dismiss, id., is **DENIED** as to Cheek Plaintiffs' state-

law causes of action for negligence, negligence per se, public nuisance, and trespass.

The stay of these proceedings is hereby lifted.  The Parties are **ORDERED** to file proposed discovery deadlines within **fourteen (14) days** of the date of this Order.

**SO ORDERED** this 13th day of September, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA